**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| JOSE SOTO, CHRISTINE EXELBY, and TANNER EASTMAN, individually, and on behalf of all others similarly situated,<br><br>*Plaintiffs*,<br><br><br>*v.*<br><br>SKY UNION, LLC, (d/b/a IGG.COM) a Nevada limited liability company,<br><br>*Defendant*. | Case No. 15-cv-04768<br><br>Judge Matthew F. Kennelly |

## FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Jose Soto, Christine Exelby, and Tanner Eastman bring this First Amended Class Action Complaint and Demand for Jury Trial against Defendant Sky Union, LLC (d/b/a IGG.com) ("IGG" or "Defendant") based on its unlawful gambling devices and sweepstakes. Plaintiffs, for their First Amended Class Action Complaint, allege as follows upon personal knowledge as to themselves and their own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by their attorneys.

### NATURE OF THE ACTION

1.      Defendant IGG operates the popular Castle Clash videogame available on Android and Apple iOS devices. Players download the game onto their mobile devices, create virtual towns and armies, and battle other Castle Clash players.

2.      While the game is free-to-play, IGG sells "gems" within the game at prices starting at $1.99 for 230 gems. While players can use the gems to improve their virtual towns and hasten their advancement in the game, these benign uses of gems merely obfuscate the unlawful games of chance IGG operates within Castle Clash. In these games of chance, players

routinely wager hundreds of dollars for the chance to win valuable prizes.

3.      Once the players win the valuable prizes, they can "cash out" by listing their accounts on the secondary market. There, players routinely sell their Castle Clash accounts for hundreds of dollars in cash.

4.      IGG also routinely conducts sweepstakes to promote Castle Clash. Yet, IGG typically requires that consumers buy gems to enter the sweepstakes—in these cases, purchase *is* necessary for entry. Worse, IGG has directly tied the amount of money that players spend to the likelihood of winning the sweepstakes.

5.      As a result, Defendant has illegally profited from thousands of consumers across the country. Accordingly, Plaintiffs Jose Soto, Christine Exelby, and Tanner Eastman—on their own behalf and on behalf of a Class and several Subclasses of similarly situated individuals—bring this lawsuit to recover statutory damages, their losses where applicable, and Defendant's ill-gotten gains, as well as costs and attorneys' fees.

**PARTIES**

6.      Plaintiff Jose Soto is a natural person and citizen of the state of Illinois.

7.      Plaintiff Christine Exelby is a natural person and citizen of the state of Michigan.

8.      Plaintiff Tanner Eastman is a natural person and citizen of the state of California.

9.      Defendant Sky Union, LLC (d/b/a IGG.COM) is a limited liability company incorporated and existing under the laws of the state of Nevada with its principal place of business located at 161 Mission Falls Lane, Suite 208, Fremont, California 94539. IGG does business throughout the United States, the state of Illinois, and this District.

## JURISDICTION AND VENUE

10.    Federal subject-matter jurisdiction exists under 28 U.S.C. § 1332(d)(2) because (a) at least one member of the class is a citizen of a state different from Defendant, (b) the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (c) none of the exceptions under that subsection apply to this action.

11.    Venue is proper because Defendant conducts business transactions in this District, the causes of action at issue arose in substantial part in this District, and Plaintiff Soto resides in this District.

## COMMON FACTUAL ALLEGATIONS

### I.    Free-to-Play and the New Era of Online Gambling

12.    The proliferation of internet-connected mobile devices has led to the growth of so-called "free-to-play" videogames. With free-to-play games, developers encourage consumers to download and play games for free while selling many low-cost items within the game itself. Developers aim to recoup their costs (and make a profit) by selling thousands of "in-game" items that start at $0.99 (purchases known as "micro-transactions") instead of charging an up-front fee.

13.    The free-to-play model has become particularly attractive to developers of games of chance (e.g., poker, blackjack, and slot machine mobile videogames, amongst others), because it allows them to generate huge profits. In 2012, free-to-play games of chance generated over $1.6 billion in worldwide revenue and are expected to grow to over $2.4 billion by the end of 2015.[1] Even "large land-based casino operators are looking at this new space" for "a healthy

---

[1]      VentureBeat, *Report confirms that social casino games have hit the jackpot with $1.6B in revenue | GamesBeat | Games | by Dean Takahashi*, venturebeat.com/2012/09/11/report-confirms-that-social-casino-games-have-hit-the-jackpot-with-1-6b-in-revenue/ (last visited Apr. 6, 2015).

growth potential."[2]

14.     With free-to-play games of chance, developers have begun exploiting the same

psychological triggers as casino operators. As one respected videogame publication put it:

> "If you hand someone a closed box full of promised goodies, many will happily
> pay you for the crowbar to crack it open. The tremendous power of small random
> packs of goodies has long been known the creators of physical collectible card
> games and companies that made football stickers a decade ago. For some … the
> allure of a closed box full of goodies is too powerful to resist. Whatever the worth
> of the randomised [sic] prizes inside, the offer of a free chest and the option to
> buy a key will make a small fortune out of these personalities. For those that like
> to gamble, these crates often offer a small chance of an ultra-rare item."[3]

15.     Another stated:

> "Games may influence 'feelings of pleasure and reward,' but this is an addiction
> to the games themselves; micro-transactions play to a different kind of addiction
> that has existed long before video games existed, more specifically, an addiction
> similar to that which you could develop in casinos and betting shops."[4]

16.     The comparison to casinos doesn't end there. Just as with casino operators, free-

to-play developers rely on a small portion of their players to provide the majority of their profits.

These "whales," as they're known in casino parlance, account for just "0.15% of players" but

provide "over 50% of mobile game revenue."[5]

17.     Game Informer, another respected videogame magazine, reported on the rise (and

danger of) of micro-transactions in free-to-play games and concluded:

> "[M]any new mobile and social titles target small, susceptible populations for
> large percentages of their revenue. If ninety-five people all play a [free-to-play]
> game without spending money, but five people each pour $100 or more in to
> obtain virtual currency, the designer can break even. These five individuals are
> what the industry calls whales, and we tend not to be too concerned with how
> they're being used in the equation. While the scale and potential financial ruin is

---

[2]     *Id.*
[3]     PC Gamer, *Microtransactions: the good, the bad and the ugly*,
http://www.pcgamer.com/microtransactions-the-good-the-bad-and-the-ugly/ (last visited Apr. 6, 2015).
[4]     The Badger, *Are micro-transactions ruining video games? | The Badger*, www.badgeronline.co.uk/micro-transactions-ruining-video-games/(last visited Apr. 6, 2015).
[5]     *Id.* (emphasis added).

of a different magnitude, a similar profitability model governs casino gambling."[6]

18.     Academics have also studied the socioeconomic effect free-to-play games have on consumers. In one study, the authors compiled several sources analyzing free-to-play games of chance (called "casino" games below) and stated that:

> "[Researchers] found that [free-to-play] casino gamers share many similar sociodemographic characteristics (*e.g.*, employment, education, income) with online gamblers. Given these similarities, it is perhaps not surprising that a strong predictor of online gambling is engagement in [free-to-play] casino games. Putting a dark line under these findings, over half (58.3%) of disordered gamblers who were seeking treatment stated that social casino games were their first experiences with gambling."
>
> …
>
> "According to [another study], the purchase of virtual credits or virtual items makes the activity of [free-to-play] casino gaming more similar to gambling. Thus, micro-transactions may be a crucial predictor in the migration to online gambling, as these players have now crossed a line by paying to engage in these activities. Although, [sic] only 1–5% of [free-to-play] casino gamers make micro-transactions, those who purchase virtual credits spend an average of $78. Despite the limited numbers of social casino gamers purchasing virtual credits, revenues from micro-transactions account for 60 % [sic] of all [free-to-play] casino gaming revenue. Thus, a significant amount of revenue is based on players' desire to purchase virtual credits above and beyond what is provided to the player in seed credits."[7]

19.     The same authors looked at the link between playing free-to-play games of chance and gambling in casinos. They stated that "[prior] research indicated that winning large sums of virtual credits on social casino gaming sites was a key reason for [consumers'] migration to online gambling," yet the largest predictor that a consumer will transition to online gambling was "micro-transaction engagement." In fact, "the odds of migration to online gambling were

---

[6]     Game Informer, *How Microtransactions Are Bad For Gaming - Features - www.GameInformer.com*, http://www.gameinformer.com/b/features/archive/2012/09/12/how-microtransactions-are-bad-for-gaming.aspx?CommentPosted=true&PageIndex=3 (last visited Apr. 6, 2015).
[7]     Hyoun S. Kim, Michael J. A. Wohl, *et al.*, *Do Social Casino Gamers Migrate to Online Gambling? An Assessment of Migration Rate and Potential Predictors*, Journal of gambling studies / co-sponsored by the National Council on Problem Gambling and Institute for the Study of Gambling and Commercial Gaming (Nov. 14, 2014), *available at* http://link.springer.com/content/pdf/10.1007%2Fs10899-014-9511-0.pdf (citations omitted).

approximately *eight times greater* among people who made micro-transactions on [free-to-play] casino games compared to [free-to-play] casino gamers who did not make micro-transactions."[8]

20.     The similarity between free-to-play games of chance and games of chance found in casinos has led governments across the world to intervene to limit their availability.[9] Unfortunately, such games have eluded regulation in the United States. As a result, and as described below, IGG's Castle Clash has thrived and thousands of consumers have spent thousands of dollars unwittingly playing Defendant's games of chance.

## II.     Defendant's Castle Clash

21.     IGG operates "Castle Clash," a mobile, free-to-play game available on Android and iOS devices, such as the Samsung Galaxy S5 and the Apple iPhone. Consumers can download and play the game for free, but IGG encourages them to purchase "gems" (the in-game currency)[10] to advance gameplay and climb leader boards (i.e., the global ranking of players).

22.     IGG sells the gems at prices starting at $1.99 for 230 gems to $99.99 for 16,800 gems. *See* Figure 1. Selling gems is big business for IGG. Globally, IGG made over $100,000,000 in 2014 through its in-game sales, with the majority of sales likely from gems.

---

[8]     *Id.*

[9]     In late August 2014, South Korea began regulating "social gambling" games, including games similar to Castle Clash, by "ban[ning] all financial transactions directed" to the games. PokerNews.com, *Korea Shuts Down All Facebook Games In Attempt To Regulate Social Gambling | PokerNews*, www.pokernews.com/news/2014/09/korea-shuts-down-facebook-games-19204 htm (last visited Apr. 6, 2015). Similarly, "the Maltese Lotteries and Gambling Authority (LGA) invited the national Parliament to regulate all digital games with prizes by the end of 2014." *Id.*

[10]     Defendant also provides players a small number of free gems as an incentive for players to "buy in" to Castle Clash over alternative games.



(**Figure 1**, showing the cost of purchasing gems within Castle Clash.)

23.     Consumers can spend purchased gems on in-game enhancements or to speed up their progress in the game. For example, consumers can spend gems to reduce the time it takes to "recruit troops" for virtual battles. However, Defendant relies on these innocuous uses of gems to hide the operation of its unlawful games of chance.

### III.     Defendant Encourages Players to Spend Gems "Rolling" for Valuable Items

24.     Within Castle Clash, IGG operates (and has profited from) several games of chance where players wager gems (previously purchased for dollars) for the chance at winning "chase" items, such as rare "Heroes" and "skills." These chase items improve players' in-game rank and increase the value of their accounts on the secondary market.

A.     *Defendant's Hero and Talent Rolls are Games of Chance*

25.     "Heroes" are central to Castle Clash's gameplay and are used in simulated combat. Players collect Heroes and dispatch them to fight in order to improve the Heroes' skills and attributes. The higher their skills and attributes, the better the Heroes will be in future combat.

26.     Not all Heroes are the same; they range from the common to the rare. For

7

instance, the "Slime" Hero is commonplace and can't be used in combat, giving it negligible value. Conversely, the "Grizzly Reaper" is powerful in combat and is a "legendary" Hero, making it valuable and coveted amongst players. To date, IGG has released more than two-dozen Heroes in Castle Clash, and, from time to time, issues special, limited-release Heroes.

27.     There are several ways to acquire Heroes. Players can periodically receive free, low-value Heroes from IGG directly; they can purchase them with "shards"[11]; or they can try to win them by wagering gems.



(**Figure 2**, showing Heroes available for purchase with shards.)

28.     While IGG operates a market where it sells Heroes for a set number of shards, *see* Figure 2, no such market exists for purchasing Heroes with gems (the in-game currency bought with real money). Instead, players can only win Heroes by "rolling" and by entering IGG's sweepstakes. In addition, IGG has made certain rare Heroes, such as "Pumpkin Duke," "Snowzilla," "Cupid," and "Moltanica" exclusively available by playing Defendant's "rolling" and sweepstakes games of chance.

29.     To "roll" for Heroes, players first purchase gems at a price of at least $1.99 for 230 gems. Then, players navigate to the "Heroes Altar" to "Hire [Heroes] With Gems" where

---

[11]     As Figure 2 indicates, "shards" are resources that are "dropped" (given to players at random intervals) in the game's "dungeon" area. Players are allotted a certain number of visits to the dungeon each day but can purchase additional visits from IGG. The sale of dungeon visits is distinct from the sale of gems for use in the games of chance described herein.

they wager a minimum of 150 gems (approximately $1.29) for the chance of winning a valuable

Hero (the "Hero Roll"). *See* Figure 3.



(**Figure 3**, showing the "Heroes Altar" where players perform one Hero Roll
for 150 gems or three Hero Rolls for 450 gems.)

30.     As the name implies, a "roll" is like the roll of a die, an event with a random

outcome. But unlike a die where each side (or number) has the same likelihood of being rolled,

IGG programmed an algorithm that awards different Heroes at different rates making the game

more like a slot machine.

31.     As one player discovered, the algorithm provides that players have less than a

0.1% chance of rolling a valuable Hero, like Pumpkin Duke, but about a 20% chance of rolling

an ordinary and effectively worthless Hero, such as Crystal Ooze.[12] Table 1, below, contains the

calculated odds of winning each Hero and their corresponding expected cost.[13]

---

[12]     These rolling statistics were compiled by a Castle Clash user that spent more than $2,000 rolling for
Heroes. *See* Tophint, *$2000 worth of gem roll stats - General Discussion - IGG - Powered by Discuz!*,
http://us forum.igg.com/forum.php?mod=viewthread&tid=140827 (last visited Apr. 6, 2015). Only IGG knows the
actual odds it programmed for each of its Heroes.
[13]     The expected costs for the listed Heroes were calculuated by multiplying the odds of winning by the cost of
a roll. For example, a player should expect to roll over 500 times to obtain the Pumpkin Duke Hero, costing
approxiately $645.

| Hero Name | Odds | Expected Cost |
|-----------|------|---------------|
| Crystal Ooze | 5:1 | $ 6.45 |
| Snowzilla | 200:1 | $ 258.00 |
| Pumpkin Duke | 500:1 | $ 645.00 |
| Cupid | 500:1 | $ 645.00 |
| Immorterp | 500:1 | $ 645.00 |
| Grizzly Reaper | 1000:1 | $ 1,290.00 |

(**Table 1.**)

32.     IGG also created a game of chance for players seeking to upgrade their Heroes'

"talents." A talent is a special attribute that modifies a Hero's combat behavior, such as a talent

that increases a Hero's speed of attack. Similar to Heroes, IGG created common talents that do

little to improve a Hero's combat capabilities and rare talents that provide sizable advantages.

33.     By default, each Hero is created with one randomly assigned talent, with the odds

favoring the assignment of a common skill. Players can improve their Hero's talents by

performing a "Talent Roll" where they wager 300 gems (approximately $2.59) for the chance to

win a rare talent.

34.     When a player performs a Hero or Talent Roll, the Castle Clash game initiates a

communication from the player's mobile device to IGG's servers located in California to

determine the outcome of the roll and to adjust the player's gem count (i.e., by deducting 150 or

300 gems). The IGG servers then complete the roll by executing a pre-programmed algorithm.

The algorithm determines the likelihood of winning each available Hero or talent and returns the

award to the player's mobile device. The process happens in a near instant. And as soon as IGG

displays the player's award, IGG then encourages them to roll again.

35.     Each time a player rolls for a Hero or Talent they risk the full amount of their

wager. For example, when performing a Hero roll for 150 gems (which costs approximately

$1.29), the player risks that Defendant will award a Hero without value (e.g., Crystal Ooze).

However, players are willing to bear that risk for the chance that Defendant will award a Hero of

high value (e.g., Grizzly Reaper).

36.     Conversely, on each Hero roll, Defendant is faced with a risk that its chance algorithm will award a rare Hero of high value rather than a Hero of negligible value. The more frequently the rare Heroes are awarded, the less desirable and valuable they become (and the less willing players are to perform rolls to acquire the previously-rare Hero, decreasing the sale of gems). By limiting the availability of certain high-power Heroes, Defendant increases their market value.

37.     Defendant created Heroes and Talents that can only be won through its games of chance (i.e., through "rolling" or sweepstakes) specifically to induce consumers to purchase gems for wagering. That is, Defendant understood that consumers would be less willing to pay a high upfront cost for rare Heroes and Talents, but that some consumers would be susceptible to the offer of paying a low upfront cost for the *chance* of winning rare Heroes and Talents.

38.     Undoubtedly, Hero and Talent rolling accounts for one of the (if not the) biggest uses of purchased gems by consumers within Castle Clash. By design, Defendant crafted the games of chance to operate ancillary and separate to Castle Clash but with prizes and awards that can hasten advancement and increase the value of players' accounts.

39.     In order to promote the sale of gems, IGG routinely sponsors "events" that, upon closer inspection, are nothing more than sweepstakes where purchases are necessary for entry. IGG's events follow the same pattern: Players that buy the most gems have the highest odds of winning, and those that don't purchase any gems are not eligible to win.

40.     For example, on October 23, 2014, IGG ran the "Great Gems Bonanza" event through which it ranked every Castle Clash player by the number of gems each purchased. At the end of the day, "the top 20 players in the rankings [] receive[d] the latest legendary Hero

Moltanica."[14] Because players had to accumulate the most gems to be eligible to win, players who did not purchase gems had no chance of winning. To further induce gem sales, IGG included in every person's ranking the exact number of gems "you'll need to buy for a chance to increase your rank" and chance of winning.[15] According to some reports, the players at the top of the rankings spent $3,000 in one day to have the best odds of winning the event.[16]

B.  *The Secondary Market for Castle Clash Accounts*

41.    The Heroes and talents awarded after rolling are valuable to IGG and players alike. While IGG offers Heroes (and gems) as prizes for sweepstakes to promote its game and induce gem sales, players have created a secondary market to buy and sell Castle Clash accounts.

42.    With the expected cost of Heroes exceeding four digits, *see* Table 1, players have used secondary markets for Castle Clash accounts to cash out. Castle Clash accounts are regularly listed for sale on traditional auction websites, such as nonparty Ebay, Inc., for $500 or more, with accounts containing rare Heroes fetching higher prices.[17]

43.    In another example, players have listed their accounts on www.epicnpc.com, an "online gaming account trading forum" where players can "buy, sell or trade [their] accounts."[18] On www.epicnpc.com, the Castle Clash account values fluctuate based on the number and type of Heroes contained in the accounts.

---

[14]    *Castle Clash Android-EN Version: Great Gems Bonanza - News - I GOT GAMES - Global Free Online Games Portal*, http://www.igg.com/news/view.php?id=270 (last visited Apr. 6, 2015). In other events, IGG awards additional gems, which have the value that IGG set, starting at $1.99 for 230 gems. *See* Figure 1.

[15]    By specifying the exact amount individuals had to pay for a chance to "win" certain Heroes that are not offered for sale—like Moltanica—Defendant identified a minimum value for them.

[16]    *Gem Bonanza - Castle Clash (Amazon) - IGG - Powered by Discuz!*, http://us.forum.igg.com/forum.php?mod=viewthread&tid=155475 (last visited Apr. 6, 2015).

[17]    *Software with Free Castle Clash Account | eBay*, http://www.ebay.com/itm/Software-with-free-castle-clash-account-/331430917139?pt=US_Hobbies_Leisure_Software&hash=item4d2ad27413 (last visited Apr. 6, 2015) (listing of Castle Clash account with rare Heroes for $500).

[18]    *WTS [Android+Ios] Castle clash cheap accounts - only paypal! No trades no buys just sell*, http://www.epicnpc.com/threads/706726-Android-Ios-Castle-clash-cheap-accounts-only-paypal!-No-trades-no-buys-just-sell?s=9fbcda320d21ed0f036f57af4f7f4a88 (last visited Apr. 6, 2015) (listing of various Castle Clash accounts with rare Heroes, ranging in price from $5 to $35).

44. And on www.PlayerUp.com—the "worlds [*sic*] most secure player 2 player account marketplace"—over 1,100 users have listed their Castle Clash accounts for sale. *See* Figure 4. Many of the consumers selling their accounts have asking prices well over $1,000. *See id.*



(**Figure 4.**)[19]

## FACTS SPECIFIC TO PLAINTIFF SOTO

45. In or around November 2013, Plaintiff Soto downloaded Castle Clash onto his mobile device and began playing the game. After Plaintiff had been playing the game for some time, he began buying gems for the purpose of rolling for Heroes and talents. Specifically, from

---

[19]     *PlayerUp - Video Game Accounts Marketplace. Player 2 Player Secure Platform*, http://www.playerup.com/accounts/castleclashaccount/ (last visited Apr. 6, 2015).

November 2013 to March 2015, Plaintiff Soto had net losses to the winner, IGG, in excess of $200. And from in or around October 2014 to March 2015, Plaintiff suffered net losses of $50 or more. Defendant kept records of each of Plaintiff's rolls and the prizes of varying value awarded after each spin, and it adjusted Plaintiff's account accordingly.

46.     In addition, from November 2013 to March 2015, Defendant sponsored and offered events to Soto where the outcome of the event was based on an element of chance and where purchase was necessary for entry. For example:

- On March 2, 2015 Defendant offered the "Hero Card Blowout!" event to Plaintiff Soto wherein "all players who buy 3,000 Gems or more in a single order" will have the chance of winning "1 random Legendary Hero";

- On October 27, 2014, Defendant offered the "Be An Alchemist" event to Plaintiff Soto wherein "you'll get one chance to receive one material each time you buy 1,400 Gems"; and,

- On October 23, 2014, Defendant promoted the "Great Gems Bonanza" event to Plaintiff Soto wherein "the top 20" "Gem Buyers" will win the "legendary Hero Moltanica."

47.     Moreover, Plaintiff Soto entered[20] into at least two of Defendant's sponsored events:

a.     On July 30, 2014, Defendant sponsored the "Smash & Win!" event where players received "one chance to smash one of those 3 eggs each time you buy 1,400 Gems. However, this doesn't include free Gems awarded by sales events." The event offered participants the chance to "win rewards like Gems, Shards, Honor Badges," and rare Heroes such as "Moltanica, Cupid and Pumpkin Duke." Defendant made clear that "rewards will be added to [winners'] account," but that to "prevent any unwanted losses, make sure you have enough empty slots in your Heroes Altar to be able to claim your Heroes rewards. No compensation will

---

[20]     Evidence indicating whether Defendant ever actually "entered" Plaintiff Soto into its unlawful sweepstakes is wholly within Defendant's control and possession but can uncovered during discovery.

be awarded as a result of this [loss]." Plaintiff purchased more than 1,400 gems for $9.99 or more to be entered into this event and suffered losses (the total purchase price of his 1,400 gems) because he did not win one of the rare Heroes; and

        b.      On April 2, 2015, Defendant sponsored the "Lucky Flippin" event where players who "[bought] a total of 1,400 Gems during the event (not inclusive of bonus Gems)" received "a chance to flip a card" that would offer the "chance to win rewards like Gems, Shards, Honor Badges, Merits, Gold Key, Crest Bags, Rare Crest Bags, Santa Boom, Vlad Dracula, Moltanica, Orksbane, Death Knight and Pumpkin Duke." To further induce players to enter the event by purchasing gems, Defendant announced: "To thank our players for all their support, we've increased the odds of getting Pumpkin Duke and Death Knight. Now it's easier than ever! Today is the last chance, so don't let it slip away!" Defendant made clear that "rewards will be added to [winners'] account," that players must "redeem your rewards within 7 days or they will be forfeited," "[that] [u]nused chances will be forfeited when the event ends," and that to "prevent any unwanted losses, make sure you have enough empty slots in your Heroes Altar to be able to claim your Heroes rewards. No compensation will be awarded as a result of this [loss]." Plaintiff purchased more than 1,400 gems for $9.99 or more to be entered into this event and suffered losses (the total purchase price of his 1,400 gems) because he did not win one of the rare Heroes.

### FACTS SPECIFIC TO PLAINTIFF EXELBY

      48.      In or around October 2013, Plaintiff Exelby downloaded Castle Clash onto her mobile device. Shortly thereafter, still in or around October 2013, Exelby began playing the game and purchasing gems to wager on Hero and talent rolls. From October 2013 to March 2015, Plaintiff Exelby had net losses exceeding $2,000. And, from October 2014 to March 2015,

Plaintiff Exelby had net losses exceeding $1,000.

49.     During each sitting, Plaintiff Exelby invariably rolled more than one time and lost $5.00 or more (approximately four Hero Rolls or two Talent Rolls). Often, Plaintiff Exelby lost more than $99 worth of gems during a single sitting.

50.     Defendant kept records of each of Plaintiff's rolls and the prizes of varying value awarded after each spin, and it adjusted Plaintiff's account accordingly. In total, Plaintiff had net losses of more than $100 by wagering on Defendant's Hero and Talent Rolls, and Defendant had a net gain of more than $100 from Plaintiff's wagers.

## FACTS SPECIFIC TO PLAINTIFF EASTMAN

51.      In late 2013, Plaintiff Eastman downloaded Castle Clash onto his mobile device and began playing the game. Shortly thereafter, Plaintiff began purchasing gems to wager on Hero and Talent Rolls. From late 2013 to December 2014, Plaintiff Eastman had net losses of more than $600 from unknowingly playing Defendant's camouflaged games of chance (*i.e.*, Defendant's Hero and Talent Rolls).

52.     Defendant kept records of each of Plaintiff's rolls and the prizes of varying value awarded after each spin and adjusted Plaintiff's account accordingly.

53.     In addition to wagering on Defendant's Hero and Talent Rolls, Plaintiff participated in several of Defendant's unlawful lottery events, such as Defendant's "Smash & Win!" event that lasted for 24 hours in July 2014. There, Defendant stated that players received "one chance to smash one of those 3 eggs each time you buy 1,400 Gems. However, this doesn't include free Gems awarded by sales events." The event offered participants the chance to "win rewards like Gems, Shards, Honor Badges," and rare Heroes such as "Moltanica, Cupid and Pumpkin Duke." Defendant made clear that "rewards will be added to [winners'] account[s],"

16

but that to "prevent any unwanted losses, make sure you have enough empty slots in your Heroes Altar to be able to claim your Heroes rewards. No compensation will be awarded as a result of this [loss]." To enter Defendant's sponsored event, Plaintiff was required to (and he did) purchase 1,400 gems at a cost of approximately $12.11 for "one chance" to "smash eggs to win rewards."[21]

## CLASS ALLEGATIONS

54.     **Definitions of the Class and Subclasses:** Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of themselves and a Class and three Subclasses defined as follows:

> **Class:** All individuals who purchased gems from Defendant and performed Hero and/or Talent Rolls in Defendant's Castle Clash.
>
> **Illinois Subclass:** All Class members domiciled in the State of Illinois who had net losses of $50 or more by wagering on Hero and/or Talent Rolls.
>
> **Illinois Sweepstakes Subclass:** All Class members domiciled in the State of Illinois who were offered entry into one of Defendant's Castle Clash events where the purchase of gems was necessary.
>
> **Michigan Subclass:** All individuals domiciled in the State of Michigan who had net losses of $5 or more in at least one sitting by wagering on Hero and/or Talent Rolls.

The following people are excluded from the Class and Subclasses: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and its current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class and Subclasses; (4) persons whose claims in this matter have been finally adjudicated on the merits

---

[21]     Evidence indicating whether Plaintiff Eastman was ever "entered" into Defendant's unlawful lotteries is wholly within Defendant's control and possession, but it can be uncovered during discovery.

or otherwise released; (5) Plaintiffs' counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

55.     **Numerosity:** On information and belief, thousands of consumers fall into the definitions of the Class and Subclasses.[22] Members of the Class and Subclasses can be identified through Defendant's records, discovery, and other third-party sources.

56.     **Adequate Representation:**  Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class and Subclasses, and they have retained counsel competent and experienced in complex class actions. Plaintiffs have no interests antagonistic to those of the Class and Subclasses and Defendant has no defenses unique to Plaintiffs. Moreover, Plaintiffs' counsel are well-respected members of the legal community, have regularly engaged in major complex litigation, and have had extensive experience in consumer class actions involving issues of similar size, scope, and complexity as the present case.

57.     **Typicality:** Plaintiffs' claims are typical of the claims of other members of the Class and Subclasses in that Plaintiffs and the members of the Class and Subclasses sustained damages and losses arising out of Defendant's wrongful conduct.

58.     **Commonality and Predominance:**  There are many questions of law and fact common to the claims of Plaintiffs and the Class and Subclasses, and those questions predominate over any questions that may affect individual members of the Class and Subclasses. Common questions for the Class and Subclasses include, but are not necessarily limited to the following:

---

[22]     According to Google, Inc., Defendant's Castle Clash for the Android operating system alone (i.e., not including the Apple iOS version) has been downloaded between 10-50 *million* times. *See Castle Clash - Android Apps on Google Play*, https://play.google.com/store/apps/details?id=com.igg.castleclash (last visited Apr. 6, 2015). Moreover, according to industry publication ThinkGaming.com, over 22,000 people download the game every day on just Apple's iOS devices (e.g., iPhones or iPads). *Castle Clash by IGG - Revenue estimates, app rankings & ARPU s*, http://thinkgaming.com/app-sales-data/4636/castle-clash-by-igg/ (last visited Apr. 6, 2015). As such, thousands of consumers undoubtedly fall into the definition of the Class and each Subclass.

(a)     Whether Defendant's Castle Clash and its Hero Roll and Talent Roll are "unlawful slot machine devices" as defined by Cal. Penal Code § 330b;

(b)     Whether Defendant's events are "unlawful lotteries" as defined by Cal. Penal Code § 319;

(c)     Whether Defendant's conduct violates Cal. Civ. Code §§ 17200 *et seq.*;

(d)     Whether Defendant has been unjustly enriched;

(e)     Whether Defendant's Castle Clash and its Hero Roll and Talent Roll are "gambling devices" as defined by ILCS 5/28-2(a);

(f)     Whether Defendant's Castle Clash and its Hero Roll and Talent Roll are "gambling devices" prohibited by Mich. Comp. Laws § 750.303(1);

(g)     Whether Plaintiffs and members of the Class and Subclasses lost by gambling any sum of money or thing of value to Defendant;

(h)     Whether Defendant is a "winner" of Plaintiff Soto's and the Illinois Subclass's and Plaintiff Exelby's and the Michigan Subclass's monies or things of value;

(i)     Whether Defendant's conduct violates the Illinois Consumer Fraud and Deceptive Business Practices Act**,** 815 ILCS §§ 505/1, *et seq.*; and

(j)     Whether Defendant's events required the purchase of gems as a condition of awarding sweepstakes prizes.

59.     **Policies Generally Applicable to the Class and Subclasses:** This class action is appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class and each Subclass as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class and

the Subclasses and making final injunctive relief appropriate with respect to the Class and each

Subclass as a whole. Defendant's policies that Plaintiffs challenge apply and affect members of

the Class and Subclasses uniformly, and Plaintiffs' challenge of these policies hinges on

Defendant's conduct with respect to the Class and each Subclass as a whole, not on facts or law

applicable only to Plaintiffs. The factual and legal bases of Defendant's liability to Plaintiffs and

to the other members of the Class and Subclasses are the same.

60.     **Superiority**: This case is also appropriate for certification because class

proceedings are superior to all other available methods for the fair and efficient adjudication of

this controversy. The harm suffered by the individual members of the Class and Subclasses is

likely to have been relatively small compared to the burden and expense of prosecuting

individual actions to redress Defendant's wrongful conduct. Absent a class action, it would be

difficult if not impossible for the individual members of the Class and Subclasses to obtain

effective relief from Defendant. Even if members of the Class and Subclasses themselves could

sustain such individual litigation, it would not be preferable to a class action because individual

litigation would increase the delay and expense to all parties and the Court and require

duplicative consideration of the legal and factual issues presented. By contrast, a class action

presents far fewer management difficulties and provides the benefits of single adjudication,

economy of scale, and comprehensive supervision by a single Court. Economies of time, effort,

and expense will be fostered and uniformity of decisions will be ensured.

61.     Plaintiffs reserve the right to revise the foregoing "Class Allegations" and "Class

and Subclass Definitions" based on facts learned through additional investigation and in

discovery.

**COUNT I**
**Violation of Cal. Penal Code § 330b**
**(On Behalf of Plaintiffs and the Class)**

62.     Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

63.     Defendant's Hero and Talent Rolls are "slot machines or devices" within the meaning of Cal. Penal Code § 330b(d) because they are machines, apparatuses, or devices that have been adapted for use in a way that, as a result of the insertion of money by electronic means, by reason of chance the users may receive a thing of value that may be given in trade for money, credit, allowance, or another thing of value.

64.     Defendant's Hero and Talent Rolls are "devices" because Defendant caused its Castle Clash mobile application to be installed on mobile devices (e.g., Apple's iPhone or iPad) that operate as discrete terminals where players can access its games of chance. However, at all times, Defendant retained ownership and control over, knowledge of, and access to the Hero and Talent Rolls (including Defendant's chance algorithms) and its Castle Clash servers.

65.     Defendant's Hero and Talent Rolls are adapted for use to allow for the insertion of money by electronic means, because a press of the "roll" button causes gems that were purchased for cash in the Castle Clash mobile application to be debited from the players' accounts and credited to Defendant.

66.     Defendant's Hero and Talent Rolls award players things of value by reason of chance because upon a "roll," consumers are awarded things of value based upon pre-determined odds or algorithms that determine the likelihood of winning a particular thing. *See* Table 1 (listing observed odds of winning specific Heroes). Moreover, after a consumer presses the "roll" button, Defendant does not take or require any input from consumers to award the prizes. The outcome of the roll is determined entirely by chance and not by any action or skill on the part of

21

the consumer. As such, Defendant's Hero and Talent Rolls are not contests of skill.

67. Defendant's Hero and Talent Rolls award Heroes and talents, which are things of value and/or things of value that may be given in trade for money, credit, allowance, or another thing of value. Specifically, Heroes and talents are things of value because IGG offers them as valuable prizes in sweepstakes and promotions where purchase is necessary (i.e., awarding rare Heroes to consumers who have spent thousands of dollars on gem purchases), and/or are things of value that may be given in trade for money, credit, allowance, or thing of value because consumers can buy and sell accounts with specific Heroes and talents on secondary markets. *See* Section III.B.

68. Defendant's Hero and Talent Rolls are not "pinball and other amusement machines or devices" as defined by Cal. Penal Code § 330b(d) because they are not predominately games of skills. In fact, the Hero and Talent Rolls do not incorporate any skill in the gameplay. Instead, consumers merely press "roll" to play. Once they do, Hero and Talent Rolls rely entirely on chance (through Defendant's algorithm) to award things of value.

69. Plaintiffs and each member of the Class have lost money as a proximate result of Defendant's violations of law and the wrongful conduct alleged herein.

70. Plaintiffs seek an order declaring that Defendant's actions constitute a violation of Cal. Penal Code § 330b and, as such, constitute a violation of California's Unfair Competition Law, Cal Bus. & Prof. Code §§ 17200, *et seq*.

**COUNT II**
**Violation of Cal. Penal Code § 319**
**(On Behalf of Plaintiffs and the Class)**

71. Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

72. Defendant operates unlawful lotteries as defined by Cal. Penal Code § 319

22

because it regularly conducts "events" where it distributes property by chance among persons who have paid valuable consideration for the chance to obtain such property.

73.     As described in Section III.A, Defendant regularly conducts events to promote its Castle Clash game, during which it offers Heroes, in-game credits, bonuses, gems, and other things of value to the winners of the events.

74.     The event winners are selected in whole or in part by chance. That is, skill plays no part in the determination of which participant will win the event.

75.     In addition, consumers must pay to participate in Defendant's events. Specifically, Defendant requires that consumers purchase a minimum number of gems to participate in and have any chance of winning Defendant's events.

76.     For example, on July 30, 2014, Defendant promoted the "Smash & Win!" event that lasted for 24 hours. There, consumers were required to purchase 1,400 gems at a cost of approximately $12.11 for "one chance" to "smash eggs to win rewards." Defendant never provided a mechanism for consumers to have a chance of winning the event without first making a purchase.

77.     Plaintiffs seek an order declaring that Defendant's actions constitute a violation of Cal. Penal Code § 319, and as such, constitute a violation of California's Unfair Competition Law, Cal Bus. & Prof. Code §§ 17200, *et seq*.

**COUNT III**
**Violation of the Unfair Competition Law**
**Cal. Bus. & Prof. Code §§ 17200, *et seq*.**
**(On Behalf of Plaintiffs and the Class)**

78.     Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

79.     California's Unfair Competition Law ("UCL"), Cal Bus. & Prof. Code §§ 17200,

*et seq.*, protects both consumers and competitors by promoting fair competition in commercial markets for goods and services.

80.     The UCL prohibits any (1) unlawful, (2) unfair, or (3) fraudulent business act or practice, including the employment of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact. A business practice need only meet one of the three criteria to be considered unfair competition.

81.     Defendant has violated the unlawful prong of the UCL by unlawfully owning and operating "slot machines or devices" within the meaning of Cal. Penal Code § 330b(d) and by operating unlawful lotteries as defined by Cal. Penal Code § 319.

82.     Defendant's unlawful conduct occurred during the marketing and distribution of its Castle Clash mobile game and in the sale of its gems, and therefore occurred in the course of Defendant's business practices.

83.     Defendant's unlawful conduct directly and proximately caused Plaintiffs and the Class actual monetary damages in the form of the price paid for each Hero and/or Talent Roll— typically $1.29 to $2.59—and/or by purchasing gems to participate in Defendant's unlawful lotteries.

84.     But for Defendant's conduct as described herein, Plaintiffs and the Class would not have spent money performing Hero and Talent Rolls in Castle Clash and/or by entering Defendant's lotteries.

85.     Plaintiffs and members of the Class downloaded Castle Clash, purchased gems, and performed Hero and Talent Rolls under the reasonable belief that the game and the rolls were lawful, which formed the basis of their bargains. Because the Hero and Talent Rolls are unlawful, Plaintiffs and members of the Class did not receive the benefits of their bargains.

86.     Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiffs seek an order (1) requiring Defendant to cease the unlawful practices described herein; (2) requiring Defendant to restore to Plaintiffs and each Class member any money acquired by means of unlawful and unfair competition (restitution); and (3) awarding reasonable costs and attorneys' fees pursuant to Cal. Code Civ. Proc. § 1021.5.

**COUNT IV**
**The Illinois Loss Recovery Statute**
**(720 ILCS 5/28-8(a))**
**(On Behalf of Plaintiff Soto and the Illinois Subclass)**

87.     Plaintiff Soto incorporates by reference the foregoing allegations as if fully set forth herein.

88.     Plaintiff Soto, members of the Illinois Subclass, and Defendant are each a "person" within the meaning of 720 ILCS 5/28-8(a).

89.     Defendant's Castle Clash and its Hero Roll and Talent Roll are gambling devices as defined by 720 ILCS 5/28-2(a) because they are devices for the reception of money or another thing of value based on chance in which money and other things of value are bet and lost. As described in Section III, above, Defendant designed Castle Clash and its Hero and Talent Rolls for players to wager gems for a chance to win prizes of value. Moreover, Defendant designed the Hero and Talent Rolls whereby a press of the "roll" buttons causes gems (which were purchased in the Castle Clash mobile application) to be debited from consumers' accounts.

90.     Defendant's Heroes and talents are things of value because IGG offers them as valuable prizes in sweepstakes and promotions where purchase is necessary (i.e., awarding rare Heroes to consumers that have spent thousands of dollars to win), and/or consumers can buy and sell accounts with specific Heroes and talents on secondary markets. *See* Section III.B.

91.     Defendant's Hero and Talent Rolls are games of chance because upon a "roll"

25

they award things of value based upon pre-determined odds of winning. Defendant programmed its Hero Roll to award one of dozens of Heroes of varying degrees of value based upon a pre-programmed algorithm that determines the likelihood of winning. *See* Table 1 (listing the odds of winning select Heroes). After a consumer presses the "roll" button, Defendant does not take or require any input from the consumer to award the prize. The outcome of the roll is determined entirely by chance and not by any action or skill on the part of the consumer. As such, Defendant's Hero and Talent Rolls are not contests of skill.

92. Plaintiff Soto and each member of the Illinois Subclass are "losers" because they each purchased and then wagered gems for each roll (a minimum of 130 gems or $1.29 for a Hero Roll and 300 gems or $2.59 for a Talent Roll) and, on the whole, had the total of their wagers exceed the value of the prizes they received. In addition, Plaintiff Soto and the members of the Illinois Subclass had the value of their wager deducted from their accounts concurrently with a roll. In total, Plaintiff Soto and each member of the Illinois Subclass have suffered net losses of $50 or more by performing Hero and/or Talent Rolls where they were, in sum, awarded prizes of no to little value.

93. Defendant is a "winner" because it participates in the games of chance and has a direct stake in the outcome of the gambling. Specifically, Defendant developed Castle Clash, programmed the Hero and Talent Roll functionality, including the algorithm that determines the chance of winning prizes of value, provides access to the Hero and Talent Rolls, and obtains all of the money that people lose by rolling.

94. Plaintiff Soto and the members of the Illinois Subclass delivered gems and money to Defendant through the Castle Clash mobile game. That is, Defendant authored an electronic method of converting money to gems and programmed Castle Clash to deduct gems from

Plaintiff's and the members of the Illinois Subclass's accounts concurrently with a roll.

95.     Plaintiff Soto's and each member of the Illinois Subclass's losses occurred in

Illinois because Defendant caused its Castle Clash mobile application to be installed on devices

within the state of Illinois. As such, the Castle Clash mobile application caused such devices in

Illinois to operate as discrete terminals for Defendant's gambling devices.

96.     As a direct and proximate result of Defendant's operation of the gambling

devices, Plaintiff Soto and each member of the Illinois Subclass have suffered net losses of $50

or more. Plaintiff Soto, on behalf of himself and the Subclass, seeks an order (1) requiring

Defendant to cease the operation of its gambling devices; and/or (2) awarding the recovery of all

lost monies, interest, and reasonable attorneys' fees, expenses, and costs to the extent allowable.

**COUNT V**
**Violations of the Illinois Prizes and Gifts Act**
**(815 ILCS 525/40)**
**(On Behalf of Plaintiff Soto and the Illinois Sweepstakes Subclass)**

97.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth

herein.

98.     Defendant sponsored a written promotional prize offer that was sent to Plaintiff

and members of the Illinois Sweepstakes Subclass while they were in Illinois.

99.     Defendant's events offered and awarded prizes, as defined by 815 ILCS 525/10,

because IGG offered and awarded things of value to participants in real or purported contests,

competitions, and/or sweepstakes that involved an element of chance.

100.    Defendant, acting as the event's sponsor, required that each person pay it money

(by purchasing gems) as a condition for competing for a prize.

101.    Defendant's events did not disclose that no purchase is necessary to compete for a

prize because Defendant did require a purchase for a person to compete for a prize.

102.    Defendant, as the developer, distributor, and marketer of Castle Clash created the rules and conditions of entry for all of its events and at all times acted intentionally.

103.    Plaintiff and each member of the Illinois Sweepstakes Subclass suffered a loss by entering into Defendant's events when they purchased gems.

104.    As a direct and proximate result of Defendant's events, Plaintiff and each Illinois Sweepstakes Subclass member have lost at least $1.99 during each event. Plaintiff, on behalf of himself and the Illinois Sweepstakes Subclass, seeks an order (1) requiring Defendant to cease its offending events; and (2) awarding whichever is greater: $500 or twice the amount of all lost monies, reasonable attorneys' fees, and court costs to the extent allowable.

**COUNT VI**
**Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act**
**(815 ILCS §§ 505/1, *et seq.*)**
**(On Behalf of Plaintiff Soto and the Illinois Subclass)**

105.    Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

106.    The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") (815 ILCS §§ 505/1, *et seq.*) protects both consumers and competitors by promoting fair competition in commercial markets for goods and services.

107.    The ICFA prohibits any unlawful, unfair, or fraudulent business acts or practices including the employment of any deception, fraud, false pretense, false promise, false advertising, misrepresentation, or the concealment, suppression, or omission of any material fact.

108.    The ICFA applies to Defendant's actions and conduct as described herein because it protects consumers in transactions that are intended to result, or which have resulted, in the sale of goods or services.

109.    Defendant is a "person" as defined under section 505/1(c) of the ICFA.

110.    Plaintiff Soto and each member of the Illinois Subclass are "consumers" as defined under section 505/1(e) of the ICFA.

111.    Defendant's Heroes and Talents are "merchandise" within the meaning of section 505/1(b) and the sale of the gems is considered "trade" or "commerce" under the ICFA.

112.    Defendant's practices, as described above (including Defendant's operation of the Hero and Talent rolls and inducement of consumers to purchase gems for use at the unlawful games of chance), were unfair within the meaning of the act because they offended Illinois' public policy against unlawful and unregulated gambling and were otherwise unethical, oppressive and unscrupulous and caused substantial injury to the consumers who purchased gems for use in Hero and Talent Rolls.

113.    Defendant caused substantial injury to consumers by inducing them to purchase gems by and through the design of its Hero and Talent Rolls. The injury caused by Defendant's conduct is not outweighed by any countervailing benefits to consumers or competition, and the injury is one that consumers themselves could not reasonably have avoided.

114.    Defendant's unfair practices occurred during the marketing and sale of its gems, and therefore, occurred in the course of trade and commerce.

115.    Plaintiff Soto and members of the Illinois Subclass downloaded Castle Clash, purchased gems, and performed Hero and Talent Rolls under the reasonable belief that the game and the rolls were lawful, which formed the basis of their bargains. As such, Plaintiff Soto and members of the Illinois Subclass did not receive the benefit of their bargain because the Hero and Talent rolls are unlawful.

116.    As a direct and proximate result of Defendant's violation of the ICFA, Plaintiff Soto and each Illinois Subclass member have suffered harm in the form of monies paid for

29

Defendant's gems. Plaintiff Soto, on behalf of himself and the Illinois Subclass, seeks an order (1) requiring Defendant to cease the unfair practices described herein; (2) awarding damages, interest, and reasonable attorneys' fees, expenses, and costs to the extent allowable; and/or (3) requiring Defendant to restore to Plaintiff Soto and each Illinois Subclass member any money acquired by means of unfair practices (restitution).

**COUNT VII**
**Unjust Enrichment**
**(On Behalf of Plaintiff Soto and the Illinois Subclass)**

117.    Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

118.    Plaintiff Soto and the Illinois Subclass have conferred a benefit upon Defendant in the form of the money Defendant received from them for the purchase of gems to participate in Defendant's unlawful lotteries and sweepstakes and for the purchase of gems to wager on Defendant's Hero and Talent Rolls.

119.    Defendant appreciates and/or has knowledge of the benefits conferred upon it by Plaintiff Soto and the Illinois Subclass.

120.    Under principles of equity and good conscience, and under Illinois law, Defendant should not be permitted to retain the money obtained from Plaintiff Soto and the members of the Illinois Subclass, which Defendant has unjustly obtained as a result of its unlawful operation of slot machines and/or devices and sweepstakes. As it stands, Defendant has retained hundreds of thousands of dollars in profits generated from its unlawful games of chance and should not be permitted to retain those ill-gotten profits.

121.    Plaintiff Soto and members of the Illinois Subclass downloaded Castle Clash, purchased gems, and performed Hero and Talent Rolls under the reasonable belief that the game and the rolls were lawful, which formed the basis of their bargain. Because the Hero and Talent

Rules are unlawful, Plaintiff Soto and members of the Illinois Subclass did not receive the benefits of their bargains.

122.    Accordingly, Plaintiff and the Subclass seek full disgorgement and restitution of any money Defendant has retained as a result of the unlawful and/or wrongful conduct alleged herein.

**COUNT VIII**
**The Michigan Loss Recovery Statute**
**(Mich. Comp. Laws § 600.2939)**
**(On behalf of Plaintiff Exelby and the Michigan Subclass)**

123.    Plaintiff Exelby incorporates by reference the foregoing allegations as if fully set forth herein.

124.    Defendant's Hero and Talent Rolls are gambling devices that are prohibited by Mich. Comp. Laws § 750.303(1) because they are games of chance used for gaming.

125.    Defendant's Hero and Talent Rolls are not mechanical amusement devices as defined by Mich. Comp. Laws § 750.303(2) because rolls do not depend on any element of skill, as they are entirely games of chance.

126.    Defendant's Castle Clash and its Hero Roll and Talent Roll are not "redemption games" as defined by Mich. Comp. Laws. § 750.310(b), because winning the Hero and Talent Rolls depends entirely upon chance and/or other circumstances beyond the control of the player.

127.    Defendant's Hero and Talent Rolls are games of chance because upon a "roll" they award things of value based upon pre-determined odds of winning. Defendant programmed its Hero Roll to award one of dozens of Heroes of varying degrees of value based upon a pre-programmed algorithm that determines the likelihood of winning. *See* Table 1 (listing the odds of winning select Heroes). After a consumer presses the "roll" button, Defendant does not take or require any input from the consumer to award the prize. The outcome of the roll is determined

entirely by chance and not by any action or skill on the part of the consumer. As such, Defendant's Hero and Talent Rolls are not contests of skill.

128.    As described in Section III, above, Defendant designed its Hero and Talent Rolls so that players wager gems for a chance at winning prizes of value and whereby a press of the "roll" buttons causes gems (which were purchased in the Castle Clash mobile application) to be debited from consumers' accounts.

129.    Defendant's Heroes and talents are things of value because IGG offers them as valuable prizes in sweepstakes and promotions, and/or consumers can buy and sell accounts with specific Heroes and talents on secondary markets, *see* Section III.B.

130.    Plaintiff Exelby and each member of the Michigan Subclass are "losers" because they each purchased and then wagered gems for each roll (a minimum of 130 gems or $1.29 for a Hero Roll and 300 gems or $2.59 for a Talent Roll). In addition, Plaintiff Exelby and the members of the Michigan Subclass had the value of their wagers deducted from their accounts concurrently with a roll and suffered net losses of $5 or more by performing Hero and/or Talent Rolls at each sitting because Plaintiff and each member of the Michigan Subclass performed several Hero and/or Talent Rolls each time they wagered and were, in sum, awarded prizes of no to little value.

131.    Defendant is a winner of Plaintiff Exelby's and the Michigan Subclass's wagers because it participates in the games of chance and has a direct stake in the outcome of the gambling. Specifically, Defendant developed Castle Clash, programmed the Hero and Talent Rolls' functionality, including the algorithms that determine the chances of winning prizes of value, provides access to the Hero and Talent Rolls, and obtains all of the money that people lose by rolling.

132.    Plaintiff Exelby and the members of the Michigan Subclass delivered gems and money to Defendant through the Castle Clash mobile game. That is, Defendant authored an electronic method of converting money to gems and programmed Castle Clash to deduct gems from Plaintiff Exelby's and the members of the Michigan Subclass's accounts concurrently with a roll.

133.    Plaintiff Exelby's and each member of the Michigan Subclass's losses occurred in Michigan because Defendant caused its Castle Clash mobile application to be installed on devices within the State of Michigan. As such, the Castle Clash mobile application caused such devices in Michigan to operate as discrete terminals for Defendant's gambling devices.

134.    As a direct and proximate result of Defendant's operation of the gambling devices, Plaintiff Exelby and each member of the Michigan Subclass have lost $5 or more in each sitting. Plaintiff Exelby, on behalf of herself and the Michigan Subclass, seeks an order (1) requiring Defendant to cease the operation of its gambling devices; (2) awarding the recovery of all lost monies, interest, and reasonable attorneys' fees, expenses, and costs to the extent allowable; and (3) awarding the recovery of three times Plaintiff Exelby's and the Michigan Subclass's losses to the extent allowable.

**COUNT IX**
**Unjust Enrichment**
**(On Behalf of Plaintiff Exelby and the Michigan Subclass)**

135.    Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

136.    Plaintiff Exelby and the Michigan Subclass have conferred a benefit upon Defendant in the form of the money Defendant received from them for the purchase of gems to participate in Defendant's unlawful sweepstakes and wager on Defendant's Hero and Talent

Rolls.

137.    Defendant appreciates and/or has knowledge of the benefits conferred upon it by Plaintiff Exelby and the Michigan Subclass.

138.    Under principles of equity and good conscience, and under Michigan law, Defendant should not be permitted to retain the money obtained from Plaintiff Exelby and the members of the Michigan Subclass, which Defendant has unjustly obtained as a result of its unlawful operation of slot machines and/or devices and sweepstakes. As it stands, Defendant has retained hundreds of thousands of dollars in profits generated from its unlawful games of chance and should not be permitted to retain those ill-gotten profits.

139.    Plaintiff Exelby and members of the Michigan Subclass downloaded Castle Clash, purchased gems, and performed Hero and Talent Rolls under the reasonable belief that the game and the rolls were lawful, which formed the basis of their bargains. Because the Hero and Talent Rolls are unlawful, Plaintiff Exelby and members of the Michigan Subclass did not receive the benefits of their bargains.

140.    Accordingly, Plaintiff Exelby and the Michigan Subclass seek full disgorgement and restitution of any money Defendant has retained as a result of the unlawful and/or wrongful conduct alleged herein.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Jose Soto, Christine Exelby, and Tanner Eastman on behalf of themselves and members of the Class and Subclasses pray for the following relief:

a.    Certify this case as a class action on behalf of the Class and Subclasses as defined above and appoint Jose Soto, Christine Exelby, and Tanner Eastman as Class and Subclass representatives and their undersigned attorneys as Class Counsel;

b.     Declare that Defendant's actions, as set out above, violate Cal. Penal Code § 330b, Cal. Penal Code § 319, California's Unfair Competition Law, and the Illinois Prizes and Gifts Act;

c.     Award Plaintiffs' and the Class's damages and/or require Defendant to restore to Plaintiffs and each Class and Subclass member any money acquired by means of unlawful and unfair competition (restitution);

d.     Enter judgment against Defendant, in the amount of the losses suffered by Plaintiffs Soto and Exelby and each member of the Illinois and Michigan Subclasses and/or three times their losses where appropriate;

e.     Award Plaintiff Soto and the Illinois Sweepstakes Subclass whichever is greater: $500 or twice the amount of pecuniary losses they suffered;

f.     Enter judgment against Defendant for monetary, actual, consequential, and compensatory damages caused by its unfair conduct;

g.     Award Plaintiffs and the members of the Class and Subclasses reasonable costs and attorneys' fees;

h.     Award Plaintiffs and the members of the Class and Subclasses pre- and post-judgment interest;

i.     Enter judgment for injunctive, statutory and/or declaratory relief as is necessary to protect the interests of Plaintiffs and the members of the Class and Subclasses; and

j.     Award such other and further relief as equity and justice may require.

**JURY DEMAND**

Plaintiffs request a trial by jury of all claims that can be so tried.

Respectfully Submitted,

**JOSE SOTO, CHRISTINE EXELBY, AND
TANNER EASTMAN**, individually and on behalf
of all others similarly situated,

Dated: July 10, 2015      By: /s/ Benjamin H. Richman
                  One of Plaintiffs' Attorneys

Rafey S. Balabanian
rbalabanian@edelson.com
Benjamin H. Richman
brichman@edelson.com
Amir C. Missaghi
amissaghi@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

## CERTIFICATE OF SERVICE

I, Benjamin H. Richman, an attorney, hereby certify that on July 10, 2015, I served the above and foregoing *First Amended Class Action Complaint and Demand for Jury Trial*, by causing true and accurate copies of such paper to be filed and transmitted to all counsel of record via the Court's CM/ECF electronic filing system.

/s/ Benjamin H. Richman