## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

JOSE SOTO, CHRISTINE EXELBY, and
TANNER EASTMAN, individually, and on
behalf of all others similarly situated,

          *Plaintiffs*,

     *v.*

Sky Union, LLC, (d/b/a IGG.COM) a Nevada
limited liability company,

        *Defendant*.

Case No. 15-cv-04768

Judge Matthew F. Kennelly

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................1

BACKGROUND .........................................................................................................4

ARGUMENT ..............................................................................................................5

I.      LEGAL STANDARD ........................................................................................5

II.     INDIVIDUALS WAGER AND WIN THINGS OF VALUE ........................6

III.    PLAINTIFFS WERE HARMED AS A DIRECT RESULT OF IGG'S
        CONDUCT ..........................................................................................................9

IV.     PLAINTIFF SOTO STATES A VALID CLAIM UNDER THE ILRS .....10

        A.      Plaintiff Soto Adequately Pleads that He Lost Things of Value .....11

        B.      Defendant Stands to Win Through its Unlawful Gambling .............12

V.      PLAINTIFF EXELBY STATES A VALID CLAIM UNDER THE MLRS ..........13

VI.     IGG'S "EVENTS" ARE ILLEGAL SWEEPSTAKES UNDER ILLINOIS
        LAW ..................................................................................................................15

VII.    PLAINTIFFS SUFFICIENTLY PLEAD THEIR CONSUMER PROTECTION
        CLAIMS ............................................................................................................16

        A.      Plaintiffs Did Not Receive the Full Benefit of Their Bargain .........16

        B.      Plaintiffs Sufficiently Allege Their Claim Under the UCL .............18

                i.      IGG'S Penal Code violations are proper bases for Plaintiffs' UCL
                        claim ............................................................................................18

                ii.     Castle Clash violates California Penal Code § 330b .................20

                iii.    Castle Clash's Events Violate California Penal Code § 319 ...................22

        C.      Plaintiff Soto States a Valid Claim Under the ICFA .......................23

VII.    PLAINTIFFS STATE VALID CLAIMS FOR UNJUST ENRICHMENT ...............24

CONCLUSION ..........................................................................................................26

## TABLE OF AUTHORITIES

**United States Supreme Court Cases:**

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .................................................................................6

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) .................................................................................6

*BMW of N. Am., Inc. v. Gore*,
  517 U.S. 559 (1996) .............................................................................. 19

**United States Court of Appeals Cases:**

*Batson v. Live Nation Entm't, Inc.*,
  746 F.3d 827 (7th Cir. 2014) ................................................................23

*Davis v. HSBC Bank Nevada, N.A.*,
  691 F.3d 1152 (9th Cir. 2012) ............................................................. 19

*In re MasterCard Int'l Inc.*,
  313 F.3d 257 (5th Cir. 2002) ................................................................10

*In re Pomona Valley Med. Grp., Inc.*,
  476 F.3d 665 (9th Cir. 2007)................................................................ 19

*Pisciotta v. Old Nat'l Bancorp*,
  499 F.3d 629 (7th Cir. 2007) .............................................................. 5-6

*TRW Title Ins. Co. v. Security Union Title Ins. Co.*,
  153 F.3d 822 (7th Cir. 1998) ................................................................24

*Wigod v. Wells Fargo Bank, N.A.*,
  673 F.3d 547 (7th Cir. 2012) ................................................................23

**United States District Court Cases:**

*1756 W. Lake St., LLC v. Am. Chartered Bank*,
  No. 14-cv-1869, 2014 WL 5073354 (N.D. Ill. Oct. 9, 2014) ........................7, 8

*ABN AMRO, Inc. v. Capital Int'l Ltd.*,
  No. 04-cv-3123, 2007 WL 845046 (N.D. Ill. Mar. 16, 2007) .................... 8

*Animal Legal Def. Fund v. Great Bull Run, LLC*,
  No. 14-cv-01171, 2014 WL 2568685 (N.D. Cal. June 6, 2014) ............. 19

*Boyd v. U.S. Bank, N.A., ex rel. Sasco Aames Mortg. Loan Trust, Series 2003-1,*
    787 F. Supp. 2d 747 (N.D. Ill. 2011) ...............................................................24

*Claridge v. RockYou, Inc.,*
    785 F. Supp. 2d 855 (N.D. Cal. 2011) .............................................................17

*Ehret v. Uber Techs., Inc.,*
    68 F. Supp. 3d 1121 (N.D. Cal. 2014) ............................................................17

*Fahrner v. Tiltware LLC,*
    No. 13-cv-0227, 2015 WL 1379347 (S.D. Ill. Mar. 24, 2015) ..........................12

*Hill v. Wells Fargo Bank, N.A.,*
    946 F. Supp. 2d 817 (N.D. Ill. 2013) ........................................................23–24

*In re Auto. Parts Antitrust Litig.,*
    29 F. Supp. 3d 982 (E.D. Mich. 2014)............................................................24

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs.,and Prods. Liab. Litig.,*
    754 F. Supp. 2d 1145 (C.D. Cal. 2010) ..........................................................17

*Kurtz v. Toepper,*
    No. 11-cv-4738, 2012 WL 33012 (N.D. Ill. Jan. 6, 2012)................................25

*Langone v. Kaiser,*
    No. 12-cv-2073, 2013 WL 5567587 (N.D. Ill. Oct. 9, 2013) ...............11, 12, 13

*Lipton v. Chattem,*
    No. 11-cv-2952, 2012 WL 1192083 (N.D. Ill. Apr. 10, 2012)..........................15

*MacDonald v. Ford Motor Co.,*
    37 F. Supp. 3d 1087 (N.D. Cal. 2014) ............................................................19

*Manning et al. v. Creative Headquarters, LLC et al.,*
    No. 11-cv-2203 (N.D. Ill. Mar. 30, 2012) .......................................................13

*Mui Ho v. Toyota Motor Corp.,*
    931 F. Supp. 2d 987 (N.D. Cal. 2013) ............................................................19

*Parker v. EMC Mortg. Corp.,*
    No. 11-cv-05682, 2014 WL 7205474 (N.D. Ill. Dec. 18, 2014) ......................23

*RBS Citizens Nat'l Ass'n v. Gammonley,*
    No. 12-cv-8659, 2015 WL 1043676 (N.D. Ill. Mar. 6, 2015) .............................8

*Sonnenberg v. Oldford Grp., Ltd.*,
　　No. 13-cv-0344, 2015 WL 1379505 (S.D. Ill. March 24, 2015) ..................10–11, 12, 13

*United States v. Jacobs*,
　　116 F. Supp. 928 (N.D. Ill. 1953) ..................................................................................11

*Volpe v. Caribbean Cruise Line, Inc.*,
　　No. 13-cv-1646, 2013 WL 3724858 (N.D. Ill. July 16, 2013) ..........................................15, 16

*Wiegel v. Stork Craft Mfg., Inc.*,
　　780 F. Supp. 2d 691 (N.D. Ill. 2011) ..............................................................................17, 18

**State Court Cases:**

*Automatic Music & Vending Corp. v. Liquor Control Comm'n*,
　　426 Mich. 452 (Mich. 1986) ..........................................................................................6

*George v. Nat'l Collegiate Athletic Ass'n*,
　　945 N.E.2d 150 (Ind. 2011) ............................................................................................8

*Gibbons v. People*,
　　33 Ill. 443 (Ill. 1864)......................................................................................................7

*Holmes v. Saunders*,
　　114 Cal. App. 2d 389 (Cal. App. 1952).........................................................................22

*Hotel Employees & Rest. Employees Int'l Union v. Davis*,
　　21 Cal. 4th 585 (Cal. 1999).............................................................................................22

*Karaus v. Bank of New York Mellon*,
　　300 Mich. App. 9 (Mich. App. 2012) ............................................................................24, 25

*Kwikset Corp. v. Superior Court*,
　　246 P.3d 877 (Cal. 2011)..................................................................................................18

*Loeffler v. Target Corp.*,
　　58 Cal. 4th 1081 (Cal. 2014) ...........................................................................................16

*Oatman v. Port Huron Chief of Police*,
　　310 Mich. 57 (Mich. 1944) .............................................................................................7

*Parise v. Detroit Entm't, LLC*,
　　295 Mich. App. 25 (Mich. App. 2011) ...........................................................................14

*Pearce v. Foote*,
　　113 Ill. 228 (Ill. 1885).....................................................................................................13

*People ex rel. Green v. Grewal,*
    61 Cal. 4th 544 (Cal. 2015) ........................................................................20, 21

*People v. Shira,*
    62 Cal. App. 3d 442 (Cal. App. 1976) ............................................................21

*Reuter v. Mastercard Int'l, Inc.,*
    397 Ill. App. 3d 915 (Ill. App. 2010) .............................................................10

*Robinson v. Toyota Motor Credit Corp.,*
    201 Ill. 2d 403 (Ill. 2002) ..............................................................................23

*Saunders v. Superior Court,*
    27 Cal. App. 4th 832 (Cal. App. 1994) ..........................................................19

*Score Family Fun Ctr., Inc. v. Cnty. of San Diego,*
    225 Cal. App. 3d 1217 (Cal. App. 1990) ......................................................6, 21

*Stop Youth Addiction, Inc. v. Lucky Stores, Inc.,*
    17 Cal. 4th 553 (Cal. 1998) ...........................................................................19

*Trinkle v. Stroh,*
    60 Cal. App. 4th 771 (Cal. App. 1997) .....................................................20, 21

**Miscellaneous:**

18 Cal. Jur. 3d Criminal Law: Crimes Against the Person (2015) ....................................22

720 ILCS 5/28 ..................................................................................... *passim*

815 ILCS 505/1 ..................................................................................1, 24

815 ILCS 525/1 ...........................................................................................18

815 ILCS 525/20 .........................................................................................15

Cal. Bus. & Prof. Code §§ 17200 ................................................................. 1

Cal. Penal Code § 319 ...........................................................................1, 22

Cal. Penal Code § 330b ................................................................1, 6, 20, 21

Fed. R. Civ. P. 8 .........................................................................................25

MCL § 432.203 .............................................................................................14

MCL § 432.209 ................................................................................................................. 14

MCL § 600.2939 ......................................................................................................... 1, 6, 14

MCL § 750.303 ................................................................................................................. 14

## <u>INTRODUCTION</u>

This case challenges Defendant Sky Union, LLC's d/b/a IGG.com's ("IGG") online application known as Castle Clash and the virtual gambling games within it—so-called "Rolls" and "Events." In particular, Plaintiffs Jose Soto ("Soto"), Christine Exelby ("Exelby"), and Tanner Eastman ("Eastman") allege that while Rolls and Events appear to be benign games of chance, they actually constitute unlawful gambling under Illinois, California, and Michigan law. They further allege that they are just three of potentially thousands of consumers who fell victim to the unlawful games of chance, each wagering and losing between $200 and $2,000. Given IGG's status as an illegal gambling operation, Plaintiffs filed suit to recoup their losses under the various state laws at issue.[1] IGG now seeks dismissal of Plaintiffs' First Amended Complaint in its entirety, raising a handful of often repeated—but ultimately unavailing—arguments.

IGG initially contends that all of Plaintiffs' claims must be dismissed because the so-called "Gems" and "Heroes" wagered in its games are not "things of value" as contemplated by the gambling statutes in question. That argument misses its mark for two reasons. First, IGG *itself* assigns value to Gems (as evidenced by its sale of the Gems—starting at a price of $1.99 for 230 Gems), and Heroes (by offering them to players for spending certain amounts on Gems). And second, players of IGG's games all have the opportunity to (and, in fact, often do) cash-out their accounts on the secondary market in exchange for real currency.

---

[1] In their First Amended Complaint ("FAC"), Plaintiffs allege causes of action for (1) recovery under the Illinois Loss Recovery Statute, 720 ILCS 5/28-8(a) ("ILRS"); (2) recovery under the Michigan Loss Recovery Statute, MCL § 600.2939 ("MLRS"); (3) recovery under the Illinois Prizes and Gifts Act, 815 ILCS 525/40 ("Prize Act"); (4) violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*, ("UCL") by way of violations of both California Penal Code ("Penal Code") § 330b & § 319; (5) violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS §§ 505/1, *et seq.* ("ICFA") by way of violations of the Prize Act and 720 ILCS 5/28-2(a); and (6) unjust enrichment under the laws of Illinois and Michigan.

IGG argues further that it was not the proximate cause of Plaintiffs' damages because IGG's transactions with Plaintiffs concluded immediately after their purchase of Gems, not after their subsequent wagering of the Gems. That argument fails too. The law is clear that where a gambling operator—like IGG—participates in the wagers at issue, the conduct continues throughout the entire wagering process and through the final result of the game. Because IGG directly participates in every aspect of the alleged illegal wagering—it participates in every wager, awards consumers Heroes and "Talents" when they win, accepts payments for entry into Events, and benefits directly from the award of prizes—it cannot escape liability by artificially narrowing the scope of its conduct.

IGG next contends that Soto's ILRS claim fails because (1) Soto did not lose and IGG did not win things of value, and (2) Soto failed to adequately plead his loss. That is wrong too. As to the former, Soto alleges that he paid money for the purpose of "rolling" for Heroes and Talents (not for in-game enhancements) and subsequently lost it all on the Rolls. Soto further alleges that all of the money he spent to play the games (e.g., $50 in the six months preceding his filing) was accepted and retained by IGG—in other words, IGG won the wagers and Soto got nothing in return.

IGG also argues that Exelby failed to state a claim under the MLRS because she did not suffer a loss and the MLRS has been superseded by the Michigan Gaming Control and Revenue Act ("MGCRA"). Both of those arguments fail. First, Exelby alleges that she suffered a loss in the form of the more than $2,000 she paid IGG for Gems for the purpose of wagering them on Rolls, and subsequently lost all of that money when she didn't receive Heroes or Talents worth her wagers. And second, the MGCRA does not supersede the MLRS because it regulates real-life casino gambling.

IGG next contends that its Events are legal under the Prize Act because (i) Soto cannot show that he suffered a loss when he received what he purchased (Gems), (ii) that he failed to allege IGG intentionally violated the statute, and (iii) that the players were not awarded "prizes." Those

arguments lack merit. Soto suffered a loss under the Prize Act because he was required to purchase Gems to enter the Events (typically at the cost of $9.99) when the statute requires he be allowed to participate for free. He also alleges that IGG acted intentionally in its violation, because it knowingly and repeatedly required him to pay for the Events. Finally, IGG offered awards of Gems, Heroes, and Talents through its Events, which (as discussed above) have value and constitute "prizes."

Next, IGG argues that Plaintiffs' consumer protection claims must fail because consumers received the benefits of their bargains and thus cannot establish a pecuniary loss. Not only did Plaintiffs suffer pecuniary losses (in the amounts of more than $200, $2,000, and $600) because of IGG's conduct, but they also did not receive the benefits of their bargains. Indeed, Plaintiffs bargained to participate in Rolls and Events they believed to be legal but instead were lured into playing unlawful games and participating in unlawful sweepstakes. Since Plaintiffs did not receive the benefits of their bargains, their UCL and ICFA claims should survive.

IGG nevertheless contends that (i) Plaintiffs improperly plead claims under the California Penal Code, which does not provide for a private right of action, (ii) the Rolls do not violate § 330b because they don't operate upon the insertion of money and aren't games of chance, and (iii) the Events do not violate § 319 because individuals paid for and received Gems. IGG is wrong. First, the UCL provides plaintiffs the avenue through which they can bring claims. Next, the Rolls operate upon the insertion of Gems—or things of value—which were purchased with money, and upon the press of the "roll" button. They are also games of chance because they operate upon IGG's algorithms and do not require—let alone allow—individuals to exert control over the outcome. And finally, the fact that players received the paid-for Gems in addition to a prize makes no difference under § 319, as courts have regularly held that events fall within the Prize Act's purview even when consumers have paid for (and receive) something along with the chance to win a prize.

3

Plaintiff Soto has also successfully pled a claim for IGG's violations of the ICFA based on IGG's illegal operation of an unlawful gambling device and sweepstakes pursuant to the ILRS. But even if he hadn't, Soto sufficiently alleges that IGG's conduct violates public policy because it promotes illegal gambling and causes individuals to suffer substantial injury.

Finally, IGG argues that Soto's and Exelby's claims for unjust enrichment fail because they are duplicative of their UCL and ICFA claims. That is wrong. Unlike their UCL and ICFA claims, Plaintiffs must plead (and prove) that IGG received a benefit to their detriment and that its retention of that benefit would be unjust. They also seek different relief through the claims—e.g., Plaintiffs seek the return of all money obtained through unfair means, an injunction, costs, and attorneys' fees through the ICFA and UCL claims and restitution of the benefit conferred upon IGG through the unjust enrichment claims.

For these reasons and as explained further below, the Court should deny IGG's motion.

## BACKGROUND

IGG operates the popular Castle Clash videogame, offering the software to consumers on various mobile devices. Though IGG allows individuals to download the application for free, it sells consumers virtual in-game currency in the form of "Gems," which consumers use to wager in its in-application virtual casino or purchase for entry into various sweepstakes. (FAC ¶ 2.) To promote the sale of its Gems, IGG allows consumers to participate in "Events," which require players to spend a certain minimum amount on Gems for the opportunity to win a rare and valuable item. (*Id.* ¶¶ 39–40, 47, 53, 75–76, 100–102.) Many of these Events base a player's chance of winning upon how much they spend on Gems, resulting in some players spending thousands of dollars to enter into these "give-away" opportunities. (*Id.* ¶¶ 39–40.)

Once players have purchased Gems, they can be used to improve a consumer's gameplay experience or be spent on prize rolls ("Rolls"), IGG's game of chance which allows players to win various in-game items. (*Id.* ¶¶ 28–33.) Similar to traditional casinos, consumers regularly spend hundreds of dollars in virtual currency on the Rolls chasing the opportunity to "win big" in the form of rare and valuable items. (*Id.* ¶ 2.) IGG has capitalized on the popularity of this game of chance in the form of millions of dollars in profits from unknowing consumers. (*Id.* ¶ 22.)

IGG's Rolls operate like any physical slot machine at a real-world casino. Consumers first purchase virtual currency for use on Rolls in the form of Gems—like a player would otherwise purchase chips to wager. (*Id.* ¶ 29.) Consumers then wager Gems in the application to purchase a "roll." (*Id.*) When a consumer "rolls," the software's internal algorithms determine if, and what prize, a consumer has won. (*Id.* ¶¶ 30–31, 34–37, 68, 89–94, 125.) But once the button is pressed, a consumer can't interact with the game to change the outcome. (*Id.* ¶¶ 34–35, 65–66, 68, 89–91.) The prizes won through the Rolls can be used to enhance consumers' in-game experience or be stored and accumulated in an account to later be sold on the secondary market. (*Id.* ¶¶ 23–24, 41–44.)

Plaintiffs downloaded and began playing Castle Clash on their mobile devices in 2013. (*Id.* ¶¶ 45, 48, 51.) Like numerous other consumers, they purchased Gems for the purpose of wagering on what they believed to be legal Rolls. (*Id.*) As a result of those wagers, they lost—and IGG won— hundreds of dollars. (*Id.*) IGG also offered Plaintiffs the chance to win rare prizes in its Events in exchange for purchasing Gems. (*Id.* ¶ 39.) Soto and Eastman purchased the Gems required to participate in these Events. (*Id.* ¶¶ 47, 53.)

## ARGUMENT

## II. LEGAL STANDARD.

On a motion to dismiss, courts must view all facts in a complaint and draw all reasonable inferences in the light most favorable to the plaintiff. *Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629,

633 (7th Cir. 2007). Detailed factual allegations are not required. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Instead, "[t]o survive a motion to dismiss, a complaint need only contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Id.* at 678 (citing *Twombly*, 550 U.S. at 570). As explained below, Plaintiffs' FAC easily meets and exceeds these requirements.

## II.    INDIVIDUALS WAGER AND WIN THINGS OF VALUE.

As an initial matter, IGG makes the conclusory argument that "Gems, heroes, and talents have no 'value' in the context of anti-gambling law . . . ." (Mot. at 8.) That argument ignores the liberal interpretations required of the California, Michigan, and Illinois laws, which assign a particularly loose meaning to "things of value".

Indeed, Section 330b of the Penal Code expressly (and liberally) recognizes the illegality of a device that awards prizes "whether a thing of value or otherwise" which "may be exchanged for any money" or "given in trade." Cal. Penal Code § 330b. In fact, California courts have regularly held that "[a] reward of extended play by a video game for winning"—i.e., a free replay—is by itself "a 'thing of value' within the meaning of the Penal Code definition." *Score Family Fun Ctr., Inc. v. Cnty. of San Diego*, 225 Cal. App. 3d 1217, 1220 (Cal. App. 1990).

Michigan is just as liberal in its interpretation, as it allows individuals to bring a claim if they "los[t] any money or goods" in order to "recover damages to the amount of the said…goods." *See* MCL § 600.2939(1). Thus, the Michigan statute *on its face* recognizes that things other than money have value. Michigan courts have also held that free replays are things of value. *Automatic Music & Vending Corp. v. Liquor Control Comm'n*, 426 Mich. 452, 457 n.2 (Mich. 1986) (collecting cases and finding something is a thing of value if the player ordinarily would have had to pay for it);

*Oatman v. Port Huron Chief of Police*, 310 Mich. 57, 59 (1944) ("Since[] free plays…would ordinarily cost the player five cents each, the opportunity to have free plays is a thing of value.").[2]

And while Illinois courts are admittedly more conservative in their interpretation of "things of value," they recognize "things of value" to be "within the letter and spirit of the statute" if "the winner can, in fact, without any violation of the law, obtain value for them." *Gibbons v. People*, 33 Ill. 443, 446 (Ill. 1864).

Here, Gems, Heroes, and Talents are "things of value" for several reasons. First, IGG itself assigns value to Gems by setting the prices at which they are sold. (FAC ¶ 2 ("[S]tarting at $1.99 for 230 gems.").) It also directly assigns value to Heroes by offering them to players for spending certain amounts on Gem purchases. (*Id.* ¶¶ 28, 40 n.15 ("By specifying the exact amount individuals had to pay for a chance to "win" certain Heroes that are not offered directly for sale . . . [IGG] identified a minimum value for them.").) Likewise, the Talents awarded by IGG's Rolls affect and increase the value of the Heroes to which they are attached. (*Id.* ¶¶ 32–33.) Gems, Heroes, and Talents also have value in the sense that players can and do "cash" them out on secondary markets for real money.[3] (*See* FAC ¶¶ 41–44); *see also 1756 W. Lake St., LLC v. Am. Chartered Bank*, No. 14-cv-1869, 2014 WL 5073354, at *4 (N.D. Ill. Oct. 9, 2014) (finding fair market value is "the price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's-length transaction; the point at which supply and demand intersect.") (citation omitted).

---

[2]     Rather than defer to appropriate authorities, IGG relies on the "official" minutes and analysis of the Washington State Gambling Commission to support its argument that the prizes it awards are not things of value. (Mot. at 8–9.) Setting aside that Washington law has no application here, those "interpretations" were never adopted by the Commission pursuant to the statutorily mandated rulemaking process, and thus are not binding on Washington courts (let alone this Court). In any event, the pamphlet attached by IGG to its motion actually supports the idea that its online games could constitute illegal gambling—because where, as here, "the virtual money [or prize] can be sold or redeemed for 'real' money . . . the game is illegal." (Dkt. 18-2 at 12.)

[3]     IGG's argument that Gems, Heroes, and Talents "can never be cashed-out," pursuant to its supposed terms does not change their status because the terms cannot be considered. (Mot. at 9.)

IGG's reliance on *George v. Nat'l Collegiate Athletic Ass'n*, 945 N.E.2d 150 (Ind. 2011) does not change that. (Mot. at 9.) In *George*, the court found the existence of a secondary market for a ticket lottery wasn't relevant in determining whether a prize had value because when the NCAA distributed its game tickets, the "market value equaled the face value" and the "speculative nature of the secondary market [made] it an inappropriate consideration in determining [value]…." *George*, 945 N.E.2d at 160. Here, on the other hand, "[t]here is already a verifiable market against which the value of the [items] may be measured, and there is little speculation as to what the [items] will be worth on the secondary market, except for routine market fluctuation." *Id.* at 159. That is, at the time IGG awarded the items, there was already a clearly established prices for the items on the secondary market—not a speculative one. *See also 1756 W. Lake St.*, 2014 WL 5073354, at *4.[4]

IGG nevertheless argues that Gems, Heroes, and Talents cannot have value because they remain part of the game and consumers never take ownership of them. Those arguments fail for two reasons. (Mot. at 8.) First, both rely on IGG's supposed terms of service, which cannot properly be considered by the Court at this stage. *See ABN AMRO, Inc. v. Capital Int'l Ltd.*, No. 04-cv-3123, 2007 WL 845046, at *3 (N.D. Ill. Mar. 16, 2007) ("A court is not to consider documents or allegations extrinsic to the pleadings on a Rule 12(b)(6) motion."). Though there is a "narrow exception" that allows documents to be considered "if they are referred to in the plaintiff's complaint and are central to [their] claim[s]," the terms at issue do not fit into either category. *See RBS Citizens Nat'l Ass'n v. Gammonley*, No. 12-cv-8659, 2015 WL 1043676, at *6 (N.D. Ill. Mar. 6, 2015) (refusing to consider a document that was "mentioned nowhere in Plaintiff's allegations and is certainly not "central" to Plaintiff's claim[.]"). That is because they were not attached to, were not

---

[4]    IGG also argues that if a secondary market can "transform anything into a gambling[*sic*], anything (*e.g.*, selling a free play received by change playing Pac-man) could be converted into gambling." (Mot. at 9.) That is not true, because only games that satisfy the elements of games of chance would be illegal. (For example, Pac-man would not meet the standard because it is a game of skill.)

8

incorporated in, and were not even referenced by the FAC, and not a single Plaintiff alleges to have been presented them. Thus, they cannot be considered.

And second, even if the terms could be considered, they don't change the fact that consumers take possession of the Gems, Heroes, and Talents within their accounts, can choose to use and wager them within the game, and can transfer accounts through a relatively simple sale on the secondary market.[5] (FAC ¶¶ 23, 28–29, 32, 42.) This level of possession and control over the virtual currency and prizes is all that is needed here, as the statute does not even require ownership. 720 ILCS 5/28-8.

## III.     PLAINTIFFS WERE HARMED AS A DIRECT RESULT OF IGG'S CONDUCT.

IGG next argues that none of Plaintiffs' damages were proximately caused by its conduct "because they could not have lost *money* 'wagering'." (Mot. at 10.) To hear IGG tell it, because the only time Plaintiffs exchange money is through the purchase of Gems—rather than their wagering—the conduct at issue is complete before any gambling can take place and all that Plaintiffs stand to lose are Gems (not money).[6] That is a distinction without a difference. Here, Plaintiffs merely converted their real-world currency into virtual Gem-currency to make wagers, which is no different than in a physical casino where individuals insert money into machines and are presented with "credits," or exchange money for chips to wager at gaming tables. Thus, the money that Plaintiffs spent in purchasing—and thereafter wagering and losing—the Gems at issue was indeed a direct and proximate result of IGG's illegal gambling practices.

---

[5]     IGG also argues that its prizes have no value because the terms prohibit the sale of accounts, but that fails for the same reason. Additionally, even if the Court could consider the terms (it cannot), they would show that consumers have the ability to trade their Gems, Heroes, and Talents with other players within IGG's server itself showing their transferable nature. (Dkt. 18-1 at 12.)

[6]     IGG also analogizes that "[p]urchasing in-game gems is no different in kind from simply buying the game outright." (Def. Mot at 10) This argument—that the purchase of consumable, single-use virtual currency is equivalent to purchasing a permanent license—is illogical, as the purchase and wager of Gems requires oversight, in-game decision-making, and future purchases. (FAC ¶¶ 2, 21–22, 24, 29, 33–38.)

Defendant relies on *In re Mastercard Int'l Inc.*, 313 F.3d 257 (5th Cir. 2002) and *Reuter v. MasterCard Int'l, Inc.*, 397 Ill. App. 3d 915 (Ill. App. 2010), to support its contention that there is a distinction between the purchase and wager of Gems. Those cases are inapposite. *See In re MasterCard*, 313 F.3d 257; *Reuter*, 397 Ill. App. 3d 915. In those cases, the defendant credit card companies acted as third-party facilitators to the gambling by completing any transactions before the gambling occurred—meaning their involvement ceased before the laying of the first wager. *In re Mastercard*, 313 F.3d at 262 (clarifying that plaintiff's claim failed because defendant could not "tak[e] custody of something bet or collect[] the proceeds of a gambling device" where its involvement ended prior to the completion of the gambling); *Reuter*, 397 Ill. App. 3d at 1213, 1215 (stating that by completing its participation prior to a wager, defendant's income "was not affected by the outcome of the gambling[,]" but clarified that the difference between that case and valid claims under Illinois law was the "defendants['] direct[] participat[ion] in [the] gambling."). By contrast, while IGG *does* participate in the exchange of money for Gems before the placing of a wager, its involvement continues from the initial purchase through future sales. Indeed, IGG offers and controls the gambling device the wagers occur on, "directly participate[s] in [the] gambling" at issue, *Reuter*, 397 Ill. App. 3d at 1215, "tak[es] custody of [the Gems] bet [when it] collect[s] the proceeds of [its] gambling device" (i.e., when players lose the Gems wagered), *see In re MasterCard*, 313 F.3d at 262, and profits (or not) based on the prizes it awards. (FAC ¶¶ 2, 5, 21–22, 24, 29, 33–38.)

Accordingly, by participating *directly* in the alleged gambling, IGG's conduct was the proximate cause of Plaintiffs' damages.

## IV.    PLAINTIFF SOTO STATES A VALID CLAIM UNDER THE ILRS.

Contrary to IGG's contentions, Soto properly alleges a recoverable loss under the ILRS, which requires a plaintiff to plead "who was the winner, who was the loser, when the loss took place, and the amount of money lost." *Sonnenberg v. Oldford Grp., Ltd.,* No 13-cv-0344, 2015 WL

1379505, at *6 (S.D. Ill. Mar. 24, 2015) (citing *Langone v. Kaiser*, No. 12-cv-2073, 2013 WL

5567587, at *4 (N.D. Ill. Oct. 9, 2013)). Soto did just that by explaining that he (the loser),

purchased, wagered, and lost at least $200 (the amount) between November 2013 and March 2015

(when) to Defendant (the winner). (FAC ¶ 45.) Though nothing more is required, IGG still argues

that his claim fails because (i) he lost nothing of value, (ii) it did not win anything of value, and (iii)

Soto failed to adequately allege his loss under the ILRS. (Mot. at 15.) Each of these arguments fails.

### A. Plaintiff Soto Adequately Pleads that He Lost Things of Value.

As an initial matter, Soto lost things of value wagering on the Rolls. In particular, within

Castle Clash, Soto converted more than $50 of real-world money into virtual-Gem currency and

subsequently wagered it on IGG's Rolls—like regular casino goers do with chips.[7] Soto bought these

Gems and made these wagers "for the purpose of rolling for Heroes and talents," (FAC ¶ 45)—not

for in-game enhancement—and subsequently "lost" them every time he was awarded a Hero worth

less than the amount wagered. Thus, Soto lost things of value when he wagered against IGG.

In addition to alleging that he lost things of value, Soto also adequately alleges his loss. In

particular, Soto alleges that between November 2013 to March 2015 he had net losses in excess of

$200, with more than $50 of those losses arising between October 2014 and March 2015.[8] (FAC ¶

45.) That is more than sufficient to state a claim under the ILRS. *See* 720 ILCS 5/28-8 (requiring a

---

[7]     IGG attempts to buttress its argument by contending (without support) that the ILRS allows the recovery of "[G]ems, *not money*." (Mot. at 15–16.) To prevent such recovery would foil the purpose of the statute and engender absurd results (e.g., poker losses would be limited to the recovery of the chips wagered, not their value). *See United States v. Jacobs*, 116 F. Supp. 928, 929 (N.D. Ill. 1953) ("It is true that criminal statutes are to be strictly construed but not so strictly as to limit their evident intent.") (citation omitted). Here, the statue actually allows third parties to recover "triple the amount" determined to be lost, so the recoverable losses cannot be limited to an exact amount of actual money wagered anyway. *See* 720 ILCS 5/28-8.

[8]     IGG's attempt to count the time between October 2014 and April 2015 as seven months is incorrect. A plaintiff utilizing the ILRS has six months from the date of the loss in question to bring a claim. Since Soto's original complaint was filed on April 10, 2015 (*see* Dkt. 1-1), the six-month period of time began to accrue on October 10, 2015. *Sonnenberg*, 2015 WL 1379505, at *8. Of course, if the Court requires greater specificity than that provided, Soto can do so in an amended pleading.

plaintiff to allege that he lost a sum of money or thing of value worth at least $50 to the defendant and that he paid within six months of raising his claims). IGG's reliance on *Fahrner v. Tiltware, LLC*, No. 13-cv-0227, 2015 WL 1379347 (S.D. Ill. Mar. 24, 2015) and *Sonnenberg v. Oldford Grp., Ltd.*, 2015 WL 13799505, doesn't change that. In both of those cases the courts dismissed the plaintiffs' claims because they were brought outside of the six-month limitations period and merely alleged "multiple" $50 losses at unspecified times over a period of years to unknown winners, when they should have alleged that a sum of $50 or more was lost to a particular individual within the previous six months, which is exactly what Soto does here. *Fahrner*, 2015 WL 1379347, at *6, 9; *Sonnenberg*, 2015 WL 1379505, at *6, 8.[9] Accordingly, Soto adequately pleads his loss.

### B. Defendant Stands to Win Through its Unlawful Gambling.

IGG is also a "winner" under the ILRS. A winner is a party who "participated in the risk of the . . . wager" and receives a gain upon the happening of a certain future event. *See Langone,* 2013 WL 5567587, at *6. Relevant here, operators of digital casino games are "winners" upon "gain[ing] the money people lost playing the games." *Id*. at *7 (citation omitted). IGG fits this bill. It participates in each wager made because (1) it either loses (awards the player a coveted Hero or Talent) or wins (awards a Hero worth less than the wager causing individuals to purchase more Gems to wager on more Rolls), (2) upon the happening of a future event (i.e., the player winning or losing a Roll). *Id.* In its simplest form, IGG wins in the same way as operators of real-world casinos and other video gambling games: by "gain[ing] the money people lost playing the games." *Id.*

IGG nevertheless argues it cannot be liable because it never "participated in nor ha[d] a stake in the outcome of a given wager," framing its conduct as more aligned with that of a company

---

[9]    It must be noted that the method of wagering here creates difficulties for tracking the amount lost with the specificity IGG demands. IGG (not Soto) has access to records of each Roll, as well as the prizes awarded. (FAC ¶¶ 34, 45.) Absent that, Soto has provided as specific an account of his losses as the information available to him (i.e., the Gems purchased and wagered and the awards received) allows.

charging entry fees than participating in gambling. (*See* Mot. at 17.) In reality, IGG has a direct stake in the gambling: it sells the Gems, allows Gems to be wagered against it, provides the software that determines the player's winnings, creates and distributes the Heroes and Talents awarded, and benefits directly as a result (in the form of the monies paid to obtain Gems for wagering). (FAC ¶¶ 2, 29, 34–38, 66–67, 89, 94.) And through each wager, IGG's revenue is directly affected, because the more consumers win (and IGG loses) on each Roll, the smaller IGG's revenue will be, and vice versa. *See Pearce v. Foote*, 113 Ill. 228, 239 (1885) (holding that defendants were winners and participated in the risk because either they, or their client, could be "winners" or "losers" depending on the "happening of a certain [future] event.").

IGG's authorities on this issue are distinguishable as well. Each of the cases it relies on involved claims against websites that merely charged an initial fee to play and offered users the ability to gamble *against each other*, not with the website operator itself. *See Langone*, 2013 WL 5567587, at *1 (charging an entry fee); *Fahrner*, 2015 WL 1379347, at *7 (charging a per-hand commission); *Sonnenberg*, 2015 WL 1379505 at *5 (same); *Manning et al. v. Creative Headquarters, LLC et al.*, No. 11-cv-2203, dkt. 83 at 3 (N.D. Ill. Mar. 30, 2012) (same). IGG's involvement is far deeper than that, as it actually participates in each wager. *Langone*, 2013 WL 5567587, at *6.

## V. PLAINTIFF EXELBY STATES A VALID CLAIM UNDER THE MLRS.

IGG also challenges Plaintiff Exelby's claim under the MLRS, arguing that it fails because (i) she did not suffer a cognizable loss, and (ii) the MLRS has been superseded by the MGCRA. (Mot. at 20.) These arguments lack merit.

13

First, and as discussed in detail above, the Gems wagered, and Heroes and Talents won, are things of value. *See* section II *supra*. As such, Exelby stood to (and did) lose things of value (Gems) to IGG through her wagers attempting to win valuable Heroes or Talents. (FAC ¶¶ 130–32.)[10]

IGG's contention that Exelby's MLRS claim is precluded is also incorrect. Though the MGCRA *can* supersede the MLRS, it does so only when it is inconsistent with the MGCRA's regulation of legalized casino gambling. *See Parise v. Detroit Entm't, LLC*, 295 Mich. App. 25, 29 (2011) (precluding MLRS claim to recover losses incurred through casino gambling made legal by the MGCRA). The plain language of the MGCRA itself only precludes the application of inconsistent laws to "casino gaming as provided for by this act." MCL § 432.203(3); *see also* MCL § 432.203(1) (authorizing "casino gaming to the extent that it is conducted in accordance with" the MGCRA). Here, the gambling alleged is not "casino gambling" controlled by the MGCRA, "a specific act that governs legalized non-Indian casino gambling in Detroit," *Parise*, 295 Mich. App. at 29, and therefore, Exelby's claims cannot be precluded.

The *Parise v. Detroit Entm't, LLC* matter is instructive on this point. There, the court dismissed a plaintiff's MLRS claim against a licensed Detroit casino, because the "plaintiff d[id] not contend that he was engaged in anything other than statutorily approved casino gaming while gambling in defendant's casino, placing bets against the casino licensee in games approved by the Michigan Gaming Control Board[]." 295 Mich. App. at 29–30. The court held that "[a]s a *participant in legalized casino gambling*, plaintiff cannot claim the remedy provided by MCL § 600.2939(1), which is clearly inconsistent with the MGCRA." *Id*. at 30. Here, however, Exelby alleged that the Rolls are made within a game of chance used for gaming in violation of MCL § 750.303(1), and that

---

[10]     The MGCRA (though inapplicable here) expressly states that "[w]agering shall not be conducted with money or other negotiable currency" and "all tokens, chips, or electronic cards used to make wagers shall be purchased from a licensed owner in the casino . . . [and] may be used only while in a casino and only for the purpose of making wagers on gaming games." MCL § 432.209(7)–(8). Thus, contrary to IGG's position, gambling does not necessarily presuppose the loss of just "money." (Mot. at 20.)

their operation and use constitutes illegal gambling. (FAC ¶¶ 124–27.) Nothing in Exelby's

allegations bring her claim within the reach of the MGCRA's purpose of regulating *legal Detroit-*

*based casino gaming*, and the MGCRA does not preempt her claim.

## VI.    IGG'S "EVENTS" ARE ILLEGAL SWEEPSTAKES UNDER ILLINOIS LAW.

IGG also argues that Soto's claims under the Prize Act fail because (i) he did not suffer a loss

and (ii) he failed to allege IGG intentionally violated the statute.[11] (Mot. at 18.) Each argument fails.

First, Soto has sufficiently alleged his loss. Soto alleges that he participated in IGG's "Smash

& Win!" and "Lucky Flippin" Events on July 30, 2014 and April 2, 2015 respectively, and that IGG

required him to purchase Gems to enter. (FAC ¶¶ 47(a)(b)). The Prize Act, however, forbids

companies like IGG from requiring payment for entry into sweepstakes like those at issue here.

*Volpe v. Caribbean Cruise Line, Inc.*, No. 13-cv-1646, 2013 WL 3724858, at *2 (N.D. Ill. July 16,

2013) (recognizing the Prize Act "prohibits a sponsor from conditioning receipt of a prize on the

payment of money[.]") (citing 815 ILCS 525/20). Thus, were it not for IGG's violation, Soto would

have been able to enter into the Events for free and would not have spent (and lost) at least $19.98[12]

competing for the prizes it offered. Thus, Soto adequately alleged his loss. *See Lipton v. Chattem*,

No. 11-cv-2952, 2012 WL 1192083, at *3 (N.D. Ill. Apr. 10, 2012) (finding a plaintiff alleged an

injury when "she would not have purchased the product had she known" its true content).

Next, there can be no question that IGG acted intentionally in offering its pay-to-play

sweepstakes. A party's intent can be inferred through circumstantial evidence and is sufficiently

alleged when a defendant has a history of repeatedly violating the statute, as IGG does here. *See*

---

[11]     IGG likewise argues that Soto's claims fail because the Heroes and talents are not things of value, but
that argument fails for the reasons discussed in Section II, *supra*.

[12]     IGG misunderstands the FAC by arguing that Soto's loss was induced by not winning a rare Hero,
(Mot. at 18), when in reality it was from receiving Heroes worth less than the amount on each wager (which
can be determined by identifying each Hero's assigned value). (FAC ¶ 47.)

*Volpe*, 2013 WL 3724858, at *2 (finding a defendant's routine offering and breach of unilateral contracts to demonstrate an intentional violation of the Prize Act).

IGG's conduct was also intentional. Not only did it purposefully create the Events and require payment for entry, *see id.* at *2, but it regularly required payment for all of its Events. (FAC ¶¶ 39–40, 46–47) (showing, among other things, that the "Great Gems Bonanza," "Hero Card Blowout," and "Be an Alchemist" required individuals to purchase Gems to participate.) In fact, the "Great Gems Bonanza" only awarded prizes to individuals who spent the *most* money on Gems. (*Id.* at ¶¶ 40–41 (IGG ranked all Gem purchasers, some spending over $3,000 in one day, and awarded the top 20 purchasers of the virtual currency with a rare item).) Thus, the frequency with which IGG violates the statute, and the harm it imposes on its players, demonstrates its intentional violation.[13]

Accordingly, Soto's claim under the Prize Act survives.

## VII. PLAINTIFFS SUFFICIENTLY PLEAD THEIR CONSUMER PROTECTION CLAIMS.

IGG also argues that Plaintiffs' consumer protection claims fail because they received the benefit of the bargain and its conduct didn't violate California or Illinois law. Those arguments fail.

### A. Plaintiffs Did Not Receive the Full Benefit of Their Bargain.

Defendant first argues that Plaintiffs' consumer protection claims should be dismissed because they (i) had to suffer a pecuniary loss (ii) but can't because they "receive[d] the benefit of their bargain"—i.e., they purchased and received Gems. (Mot. at 22-24.) That is wrong.[14]

---

[13]     IGG also argues that Soto's claim fails because "nothing is awarded," but Heroes and Talents *are* things of value and are awarded through the sweepstakes. *See* Section II, *supra*.

[14]     It is worth noting that IGG's conduct is precisely the sort of unfair competition meant to be precluded by the 'unlawful' prong. *See Loeffler v. Target Corp.*, 58 Cal. 4th 1081 (Cal. 2014) ("The UCL was intended to permit tribunals to enjoin on-going wrongful business conduct in whatever context such activity might occur and to enable judicial tribunals to deal with the innumerable new schemes which the fertility of man's invention would contrive.") (internal quotes omitted).

To allege an injury under the UCL and ICFA, plaintiffs must simply demonstrate that they suffered an economic injury. *See In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs.,and Prods. Liab. Litig.*, 754 F. Supp. 2d 1145, 1168 (C.D. Cal. 2010) ("A person whose property is diminished by a payment of money wrongfully induced is injured in his property" under the UCL) (citation omitted); *Ehret v. Uber Techs., Inc.*, 68 F. Supp. 3d 1121, 1132 (N.D. Cal. 2014) ("lost money or property as a result of [] unfair competition" provides standing under the UCL); *Wiegel v. Stork Craft Mfg., Inc.*, 780 F. Supp. 2d 691, 693 (N.D. Ill. 2011) (holding that the ICFA requires a plaintiff to show harm "in a concrete, ascertainable way" that makes her "tangibly worse off," even if the exact dollar amount of harm has not yet been identified) (citation omitted).

Here, Plaintiffs allege that they suffered economic injuries by wagering on Rolls and buying into Events. Indeed, not only do they each allege substantial damages of between $200 and $2,000, but they also explain that they typically lost (to IGG) between "$1.29 to $2.59" per Roll and the purchase price of Gems for entry into Events. (FAC ¶ 83, ¶ 45 (alleging Soto suffered net losses of more than $200 wagering), ¶ 47 (alleging Soto lost $19.98 entering into Events), ¶¶ 48–50 (alleging Exelby suffered net losses of more than $2,000 wagering, ultimately losing at least $100 to IGG's benefit), ¶ 51 (alleging Eastman suffered net losses of over $600 wagering), ¶ 53 (alleging Eastman suffered a loss of $12.11 entering into Events), ¶¶ 113–16 (alleging Soto's loss in the form of the money spent on Gems).)

And but for IGG's violation of Sections 330b and 319 of the Penal Code and 720 ILCS 5/28-2(a), the injuries would not have occurred inasmuch as there would have been no illegal device or sweepstakes to participate in in the first instance. (*Id.*); *see also Claridge v. RockYou, Inc.*, 785 F. Supp. 2d 855, 862 (N.D. Cal. 2011) (recognizing that to satisfy the requirement of "lost" money, a plaintiff need only allege she "parted, deliberately or otherwise, with some identifiable sum formerly

17

belonging to h[er] or subject to h[er] control; it has passed out of h[er] hands by . . . being . . . ceded in a gamble."); *Wiegel*, 780 F. Supp. 2d at 693 (recognizing that the injury would not have occurred but for a product defect). Thus, Plaintiffs have sufficiently alleged they sustained economic injuries to state their UCL and ICFA claims.

IGG nevertheless argues that Plaintiffs' received exactly what they bargained for: Gems. That is wrong. Plaintiffs entered into an agreement through which they paid for Gems to play a *legal* video game or enter into a *legal* sweepstakes. (FAC ¶¶ 84–85, 115.) What they received was entirely different. First, they received the opportunity to unknowingly utilize an unlawful game of chance disguised as a benign video game. (*Id.* ¶¶ 2, 51, 85, 115.) Had they known the Rolls were illegal— and that the Gems they purchased did not have the utility they bargained for—they would not have purchased them, let alone wagered them in IGG's illegal game of chance. (*Id.* ¶¶ 85, 115.) Similarly, had Plaintiffs known the Events were illegal—and that no purchase should have been required for them—they would not have paid the typical $9.99 to enter into them.[15] (*Id.* ¶¶ 47, 53.) As such, Plaintiffs did not receive the benefits of their bargains and their claims thus survive.[16] *See, e.g., Kwikset Corp. v. Superior Court*, 246 P.3d 877, 891 (Cal. 2011) (finding a plaintiff did not receive the benefit of his bargain and when he paid for properly labeled locks but received mislabeled ones).

**B.    Plaintiffs Sufficiently Allege Their Claim Under the UCL.**

IGG also argues that Plaintiffs' UCL claims fail for the additional reason that the Penal Code (which serves as the basis for them) does not include a private right of action for § 330b or § 319.

*i.    IGG'S Penal Code violations are proper bases for Plaintiffs' UCL claim.*

As an initial matter, Plaintiffs allege Counts I and II to state a violation of the Penal Code on which to base their UCL claim. The UCL "borrows violations of other laws and treats them as

---

[15]    It is the offering of (not the participation in) a sweepstakes that is illegal. *See* 815 ILCS 525/1 *et seq*.
[16]    IGG incorrectly reiterates that there is no "causal connection" between the lost money and the allegedly unlawful conduct, (Mot. Def. at 22), but that fails for the reasons discussed in Section III, *supra*.

18

unlawful practices that the unfair competition law makes independently actionable." *MacDonald v. Ford Motor Co.*, 37 F. Supp. 3d 1087, 1097 (N.D. Cal. 2014) (quoting *Davis v. HSBC Bank Nevada, N.A.,* 691 F.3d 1152, 1168 (9th Cir. 2012)). "An unlawful act is one forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made." *In re Pomona Valley Med. Grp., Inc.*, 476 F.3d 665, 674 (9th Cir. 2007) (quotation omitted). "It is not necessary that the predicate law provide for private civil enforcement." *Saunders v. Superior Court*, 27 Cal. App. 4th 832, 839 (Cal. App. 1994). Simply put, "Plaintiffs can plead a UCL violation under the 'unlawfulness' prong by pleading that a business practice violated a predicate federal, state, or local law." *Mui Ho v. Toyota Motor Corp.*, 931 F. Supp. 2d 987, 999 (N.D. Cal. 2013).

Because Plaintiffs sufficiently allege IGG's violations of the Penal Code as described below, (FAC ¶¶ 62–77), it does not matter that there is no private right of action under the Penal Code, (Mot. at 11–12), as "Plaintiffs do not seek to enforce the [] Penal Code" itself. *Animal Legal Def. Fund v. Great Bull Run, LLC*, No. 14-cv-01171, 2014 WL 2568685, at *7 (N.D. Cal. June 6, 2014). "Instead, they argue "Defendant[ is] violating the UCL through [its] unlawful business practices." *Id.* (refusing to dismiss a UCL claim and the Penal Code violation upon which it was based because though "Plaintiffs cannot directly enforce the Penal Code, they are not barred from bringing an unfair competition claim that borrows violations from the code."); *see also Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*, 17 Cal. 4th 553, 566 (Cal. 1998) (finding standing to pursue UCL claim based on violation of the Penal Code). Thus, Plaintiffs' counts arising out of violations of the Penal Code are not barred.[17]

---

[17]    Defendant also argues that there is an "obvious concern of applying the California Penal Code to non-California residents (Soto and Exelby) for harm allegedly suffered in Illinois and Michigan." (Mot. at 11 n.7.) That concern is misplaced because Plaintiffs are not seeking to enforce the Penal Code and unlike the situation in Defendant's cited authority, *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996), the unlawful conduct in question here occurred *in California*. *See* Section VII(B)(2) *supra*.

ii.     *Castle Clash violates California Penal Code § 330b.*

Next, Plaintiffs allege that IGG's operation of the Rolls violates § 330b of the Penal Code, which makes it unlawful to "manufacture", "own", or "possess" any "slot machine or device." To establish that equipment constitutes a "slot machine or device," plaintiffs must allege: (1) that the game is operated upon the insertion of money, a coin, or another thing of value, "or by any other means," (2) that the user can receive a thing of value or additional play based upon chance, and (3) that the thing of value received may be exchanged for any "money, credit, allowance or thing of value, or which may be given in trade." *See* Cal. Penal Code § 330b (d).

IGG's first concern that the game does not operate upon something being "inserted" is misplaced. (Mot. at 13.) A machine is considered operated in violation of the statute when "the player inserts money and then pushes buttons which operate the machine." *Trinkle v. Stroh*, 60 Cal. App. 4th 771, 780 (Cal. App. 1997) ("the statutes do not require that the machine begin operating directly upon insertion of a coin."). Here, the Rolls are "operated through the insertion of" Gems (or things of value)—which are automatically deducted from players' accounts and credited to IGG— upon the players' press of the "roll" button, thus satisfying this first element. (FAC ¶¶ 34, 65); *see Trinkle*, 60 Cal. App. 4th at 780 (finding a "flipperless pinball machine" was a slot machine when play was initiated by inserting money and "pull[ing] a spring-loaded plunger….").

Even if that weren't the case, operation of the Rolls still falls within "the broad scope of the statute," which allows a gambling device to be operated "by any other means." *People ex rel. Green v. Grewal*, 61 Cal. 4th 544, 559 (Cal. 2015). This element of the statute is satisfied "[e]ven [if] a coin, money, or object (e.g., a token) was not inserted into a slot, [and] the game[] w[as] commenced *by other means* analogous thereto which effectively accomplished the same result." *Id.* (emphasis in original) (finding that "the insertion of a PIN" or "account number," or "the swiping of a magnetic

20

card at the computer terminal" were such "other means"). That is because "the rule requiring strict construction of penal or civil forfeiture statutes does not require that the statute be strained and distorted in order to exclude conduct clearly intended to be within its scope[,] it being sufficient if the words are given their fair meaning in accord with the evident intent of the legislature." *Trinkle*, 60 Cal. App. 4th at 780 (modifications and quotations omitted) (quoting *People v. Shira*, 62 Cal. App. 3d 442, 460 (Cal. App. 1976)). Here, the Rolls *only* operated when individuals entered the appropriate amount of Gems (or virtual in-app currency), chose to wager them, and intentionally pressed the "roll" button. (*See* FAC ¶¶ 29–30, 32–34, 65–66.) Accordingly, their operation clearly falls within the purview of § 330d.[18]

The Rolls also constitute games of chance as required by the statute. Cal. Penal Code § 330b (d).[19] Games of chance require no skill or input from the user and are based on "hazard or chance or of other outcome of operation unpredictable to the user." *See Grewal*, 2015 WL 3893494, at *9 (finding the "software system" at issue allowed a customer to win a prize based on "hazard or chance or of other outcome of operation unpredictable to the user" because customers could "exert no influence" over the outcome "by means of skill, judgment or how well they play the game."). IGG's Rolls do exactly that. Plaintiffs allege that once a consumer presses the "roll" button, IGG "does not accept or require any input from consumers to award a prize," (FAC. ¶ 34, 56), and the outcome "is determined entirely by chance and not by action or skill on the part of the consumer." (*Id*. ¶ 66.) Because Plaintiffs can "exert no influence" over the outcome by any means, let alone "skill or

---

[18]     Indeed, in analyzing claims under § 330b, courts need not read the statute "in context of the technology available in 1950." *Trinkle*, 60 Cal. App. 4th at 784. They should instead consider whether modern technology fits within the legislature's broad reading of the statute.

[19]     Gems, Heroes and Talents, are things of value, particularly in light of California's broad interpretation of the term. *See* Section II *supra*; *Trinkle*, 60 Cal. App. 4th at 776 (finding machines which "could award hundreds of extra credits or potential free replays to a winning player, depending on the odds" slot machines); *Score Family Fun Center, Inc*, 225 Cal. App. 3d at 1221–23 (finding arcade video game that simulated card games violated § 330b because operators could, as a matter of chance, win free games or extended play).

judgment[,]" winning through the Rolls is based on "hazard or chance."[20] *Hotel Employees & Rest. Employees Int'l Union v. Davis*, 21 Cal. 4th 585, 592 (Cal. 1999) ("'Chance' means that winning and losing depend on luck and fortune rather than, or at least more than, judgment and skill.").

Accordingly, Plaintiffs clearly allege that IGG's operation of the Rolls violates § 330b.[21]

### iii. *Castle Clash's Events Violate California Penal Code § 319.*

IGG's Events also constitute illegal lotteries pursuant to Cal. Penal Code § 319. To constitute a lottery (i) property (a prize) must be distributed (ii) by chance (iii) upon the payment of consideration. Cal. Penal Code § 319. Here, the Events clearly constitute lotteries because consumers pay for and wager Gems ("consideration') and Heroes and Talents ("prizes") are distributed according to IGG's algorithms and without any input from the players ("chance").

IGG argues that the Events are not lotteries because (i) "[p]layers who choose to purchase gems receive, *in addition* to the gems, an extra in-game item," (Mot. at 14), supposedly making that "prize" free, and (ii) the prizes—as IGG's property—cannot be distributed. Those arguments fall flat. First, courts regularly hold that events constitute lotteries when people pay for (and receive) something along with the chance to win a prize. *See Holmes v. Saunders*, 114 Cal. App. 2d 389, 390 (Cal. App. 1952) ("The consideration to make such a transaction a lottery need not be paid exclusively for the chance to win the prize. It is sufficient that the consideration, as here, be paid for something else and the chance to win the prize.") (collecting cases).

---

[20]   IGG argues that it is exempt from § 330b because Castle Clash is predominately a "game of skill" and "a discrete element of the game does not convert an overall game of skill into a game of chance." (Mot. at 13 n.8.) That logic would improperly allow a casino to bypass liability by operating more games of skill than chance. The test of whether a game is one of chance, though, is "not whether the game contains an element of chance or an element of skill but which of them is the dominating factor…." 18 Cal. Jur. 3d Criminal Law: Crimes Against the Person § 901 (2015).

[21]   IGG's attempt to shield itself from liability by arguing that every consumer who wagers on Rolls "would be guilty of a misdemeanor for possessing a slot machine," (Mot. at 13 n.9), also fails. The focus of the statute is on preventing companies like *IGG* from profiting from illicit gambling and to allow harmed individuals to recover for the *defendants'* unlawful conduct. That plaintiffs would be subject to criminal liability for vindicating statutory rights provided to them by the legislature makes no sense.

Second, setting aside that IGG's arguments in this regard rely upon the terms of service that cannot be considered, Soto sufficiently alleges that IGG offers Gems, Heroes, Talents, and other resources (things of value) to the participants in its Events, because they are (i) awarded, (ii) placed on the individuals' devices, (iii) used within the individuals' accounts, and (iv) are often transferred between players upon the sale of accounts on the secondary market. (FAC ¶¶ 3, 41–44.)

Thus, Plaintiffs have alleged facts sufficient to demonstrate IGG's violation of § 319.

### C.    Plaintiff Soto States a Valid Claim Under the ICFA.

Next, the FAC adequately states a claim for violation of the ICFA as well, which "is 'liberally construed to effectuate its purpose' of protecting 'consumers against unfair…acts or practices.'" *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 574 (7th Cir. 2012). To state a claim under the ICFA, a plaintiff must allege "[an unfair] act or practice by the defendant," *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 417–18 (2002), which "(1) offends public policy; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers." *Batson v. Live Nation Entm't, Inc.*, 746 F.3d 827, 830 (7th Cir. 2014). "[A]ll three of the criteria . . . do not need to be satisfied to support a finding of unfairness…. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Id.* at 830 (internal citations omitted). Plaintiffs may also "predicate an ICFA unfairness claim on violations of other statutes or regulations…." *Parker v. EMC Mortg. Corp.*, No. 11-cv-05682, 2014 WL 7205474, at *4 (N.D. Ill. Dec. 18, 2014).

Here, Soto successfully stated an ICFA claim based upon IGG's illegal operation of a gambling device (FAC ¶¶ 105–117) and consequent violation of an Illinois gambling statute,[22] as well as its illegal sweepstakes offered in violation of the Prize Act. *See, e.g., Hill v. Wells Fargo*

---

[22]    In particular, 720 ILCS 5/28-1(3) makes it illegal to "knowingly operate[], keep[], own[] . . . manufacture[] or distribute[] any gambling device[,]" such as the Rolls at issue. *Id.*

*Bank, N.A.*, 946 F. Supp. 2d 817, 827 (N.D. Ill. 2013) ("Because [the] alleged acts violated Illinois statutory and common law, the FAC states a viable ICFA unfairness claim.").[23] Also, Soto alleges that IGG's conduct violates public policy because it promotes (and is) illegal gambling, a practice that has been outlawed in Illinois. *See Boyd v. U.S. Bank, N.A., ex rel. Sasco Aames Mortg. Loan Trust, Series 2003-1*, 787 F. Supp. 2d 747, 752 (N.D. Ill. 2011) ("[A] practice can offend public policy 'if it violates a standard of conduct contained in an existing statute or common law doctrine that typically applies to such a situation.'"). Accordingly, his ICFA claim should stand.

## VIII.   PLAINTIFFS STATE VALID CLAIMS FOR UNJUST ENRICHMENT.

IGG's final argument—that the unjust enrichment claims must be dismissed—also misses its mark. "An unjust enrichment claim is used to prevent a defendant from profit[ing] by his own wrong." *In re Auto. Parts Antitrust Litig.*, 29 F. Supp. 3d 982, 1014-15 (E.D. Mich. 2014). To state a claim for unjust enrichment, a plaintiff must allege the defendant "(1) received a benefit, (2) to [her] detriment, and (3) [its] retention of the benefit would be unjust." *See TRW Title Ins. Co. v. Security Union Title Ins. Co.*, 153 F.3d 822, 828 (7th Cir. 1998); *Karaus v. Bank of New York Mellon*, 300 Mich. App. 9, 23 (Mich. App. 2012) ("[T]he key to determining whether enrichment is unjust is determining whether a party unjustly received and retained an independent benefit.").

Plaintiffs allege they conferred a benefit upon IGG in the form of the monies they paid to purchase and wager Gems on Rolls and to participate in its Events. Plaintiffs further allege that IGG retained that benefit to their detriment and that it would be unjust for IGG to continue to do so given that the monies were obtained through an unlawful gambling operation. (FAC ¶¶ 45 (alleging Soto conferred a benefit of more than $200 through wagers), 48 (alleging Exelby conferred a benefit of

---

[23]     IGG assumes that because Plaintiff's ILRS claim has failed his ICFA claim falls short as well. (Mot. at 22.) Setting aside the fact that Plaintiff properly pleaded his ILRS claim, the ICFA provides a private right of action and does not require there to be a separate statutory violation. *See* 815 ILCS §§ 505/1 *et seq.*

more than $2,000 through wagers), 118, 120–22, 136–39.)[24] Thus, Plaintiffs have sufficiently stated their claims for unjust enrichment under the laws of both states.

Notwithstanding, IGG contends that Plaintiffs' claims are duplicative of their UCL and ICFA claims. (Mot. at 25.) That, too, is incorrect, because "Fed. R. Civ. P. 8(d)(2) permits a party to 'set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones.'" *Kurtz v. Toepper*, No. 11-cv-4738, 2012 WL 33012, at *1 (N.D. Ill. Jan. 6, 2012) (quoting Fed. R. Civ. P. 8(d)(2)). Claims are only "duplicative if they are based upon the same operative facts and allege the same injury." *Id*.

Here, Exelby's and Soto's claims for unjust enrichment require them to prove different elements than their UCL and ICFA claims because they are based on different injuries. For instance, Exelby's unjust enrichment claim is based on IGG's operation of an illegal gambling device under *Michigan law* and requires her to prove that IGG received a benefit to Plaintiff's detriment as a result of the Rolls. *Karaus,* 300 Mich. App. at 23. Similarly, Soto's unjust enrichment claim is based on violation of the Illinois gambling law, and will likewise require him to prove that IGG received a benefit to her detriment as a result of the unlawful games.

Plaintiffs' also seek different relief for each claim. Plaintiffs' claims under the ICFA and UCL seek the entry of an injunction as well as costs and attorneys' fees under each statute, whereas their unjust enrichment claims do not. (FAC ¶¶ 86, 116, 122, 140.) And their UCL and ICFA claims seek the restitution of all money "acquired by means of unlawful and unfair competition" or "by means of unfair practice," (*Id*.), while their unjust enrichment claims seek only the restitution of "any money Defendant has retained as a result of the unlawful and/or wrongful conduct alleged herein." (*Id*. ¶¶ 122, 140.) Accordingly, Plaintiffs' claims for unjust enrichment should stand.

---

[24]     Notably, any agreement related to the sale of Gems is void as a matter of law pursuant to 720 ILCS 5/28-7(a) because a portion of the consideration exchanged was Soto's money, which IGG obtained as a result of violating 720 ILCS 5/28-1(a)(3) by operating Castle Crash with its built-in gambling device.

## CONCLUSION

For the foregoing reasons, Plaintiffs Soto, Exelby, and Eastman, individually and on behalf of all others similarly situated, respectfully request that the Court enter an Order (i) denying Defendant's motion to dismiss in its entirety, (ii) requiring Defendant to answer Plaintiff's First Amended Class Action Complaint and Jury Demand, and (iii) providing such other and further relief as the Court deems reasonable and just.

Respectfully Submitted,

**JOSE SOTO, CHRISTINE EXELBY,** and **TANNER EASTMAN**, individually and on behalf of all others similarly situated,

Dated: September 29, 2015

By: /s/ Benjamin H. Richman
      One of Plaintiffs' Attorneys

Rafey S. Balabanian
rbalabanian@edelson.com
Benjamin H. Richman
brichman@edelson.com
Courtney C. Booth
cbooth@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 29, 2015, I served the above and foregoing ***Plaintiffs' Opposition to Defendant's Motion to Dismiss***, by causing true and accurate copies of such paper to be filed and transmitted to all counsel of record via the Court's CM/ECF electronic filing system.

/s/ Benjamin H. Richman