## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| JOSE SOTO, CHRISTINE EXELBY, and TANNER EASTMAN, individually and on behalf of himself and all others similarly situated, | )<br>)<br>)<br>) |
| | ) Case No. 15-cv-04768 |
| Plaintiffs, | )<br>) Judge Matthew F. Kennelly |
| v. | )<br>) |
| | ) **ORAL ARGUMENT REQUESTED** |
| SKY UNION, LLC (d/b/a IGG.com), a Nevada limited liability company, | )<br>)<br>) |
| Defendant. | ) |

## REPLY MEMORANDUM IN SUPPORT OF
## MOTION TO DISMISS FIRST AMENDED CLASS ACTION COMPLAINT
## PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)

David S. Almeida, Esq.
dalmeida@sheppardmullin.com
David M. Poell, Esq.
dpoell@sheppardmullin.com
Mark S. Eisen, Esq.
meisen@sheppardmull.com
**SHEPPARD, MULLIN, RICHTER & HAMPTON LLP**
70 West Madison Street, 48th Floor
Chicago, Illinois 60602
Telephone: (312) 499-6300
Facsimile: (312) 499-6301

*Counsel for Sky Union, LLC*

Plaintiffs' counsel's attempt to create causes of action by distorting anti-gaming statutes to portray videogames (like Castle Clash) as "illegal gambling operation[s]" should be rejected.

Plaintiffs' complaint rests on the misguided theory that in-game heroes and talents are "things of value"—in other words, that they have actual monetary value separate and distinct from the Castle Clash game. While unable to point to a single case supporting the assertion that fictional, virtual objects have intrinsic value, Plaintiffs nonetheless contend that Castle Clash is unlawful gambling because a secondary market supposedly exists to sell accounts. Leaving aside the fact Plaintiffs fail to allege they (or anyone else) ever sold their account, Plaintiffs' theory that an unsanctioned secondary market creates a "thing of value" in the gaming context has been rejected. *See George v. Nat'l Collegiate Ath. Ass'n*, 945 N.E.2d 150, 159 (Ind. 2011). If plaintiffs' theory—charitably described as novel—was accepted, it would turn *anything* with a degree of chance into illegal gambling based on the prohibited actions of consumers. Common sense dictates that heroes and talents (which cannot be cashed out in the game) have no value in the context of anti-gaming laws. If Plaintiffs' theory that heroes and talents have value were correct, then heroes and talents would be immediately taxable as gambling winnings.

Moreover, Plaintiffs' portrayal of Castle Clash as casino gambling in order to gloss over proximate cause misses the point entirely. Any monetary transaction in Castle Clash necessarily concludes with the purchase of gems, which can be used in myriad ways in the game unrelated to winning heroes and talents (*i.e.*, speeding up gameplay). Unlike casino chips, gems can never be redeemed once purchased. The subsequent use of gems cannot cause any loss or harm.

Plaintiffs' effort to analogize Castle Clash to a casino is especially inapt in the context of the specific anti-gaming laws at issue, which were designed to cover *actual gambling*, not videogames. Plaintiffs contend that they suffered cognizable "net losses" under the statutes at

issue when they received "hero[es] worth less than the amount wagered." This loss—which, at most, amounts to mere disappointment over not receiving the desired hero—underscores the inapplicability of the state anti-gaming laws as Plaintiffs nowhere explain how they value fictional items (which, indeed, have no actual value) to even plausibly determine a "net loss." In any event, and as detailed below, each of the anti-gaming claims fail on their own terms.

And finally, Plaintiffs' theory of gambling is untenable in the context of their unfair competition claims and duplicative unjust enrichment claims. Though admitting that they otherwise received *everything they bargained for*, Plaintiffs contend that they stated unfair competition and unjust enrichment claims because they bargained for legal in-app games, not illegal games. Plaintiffs' novel theory is both illogically circular and without any legal support. Plaintiffs purchased gems to enhance their in-game experience, received those gems and used those gems as they saw fit. Plaintiffs thus received *everything* they wanted and were entitled to receive. Plaintiffs' amended complaint should thus be dismissed in its entirety with prejudice.

## DISCUSSION

**I. HEROES AND TALENTS ARE NOT "THINGS OF VALUE" IN THE CONTEXT OF STATE ANTI-GAMING LAWS, AND THE EXISTENCE OF A SECONDARY MARKET DOES NOT RENDER CASTLE CLASH AN UNLAWFUL CASINO.**

Plaintiffs first contend that heroes and talents are "things of value" (and thus Sky Union is engaged in gambling) for two reasons: (i) heroes and talents are valuable because they are valued and (ii) secondary markets exist for Castle Clash accounts. (*See* DE 26 at 7.) The first is too circular to stand, and the second is irrelevant under persuasive authority and common sense.

Through their first argument, Plaintiffs contend that heroes and talents are things of value because Sky Union "assigns value" to these items. (*Id.* at 7.) This circular argument misses the point entirely. The statutes at issue make clear that fictional videogame enhancements are not "things of value" in the gambling context. As described by one California appellate court, "[t]he

usually accepted definition of 'thing' is an inanimate object"—not a fictional, ephemeral item. *Gayer v. Whelan*, 59 Cal. App. 2d 255, 261 (1943) (interpreting Cal. Penal Code § 330a); *see also* Cal. Penal Code § 330.2 (defining "thing of value" as a tangible item or representative thereof);[1] *People v. One Mech. Device*, 11 Ill. 2d 151, 156 (1957) (holding, under the Illinois LRA, the "possibility of winning a greater or lesser amount of amusement" is *not* a "valuable thing"); MCL § 750.303(3) (defining "slot machine" as capable of issuing a "token or money or property"). Fictional videogame items that cannot be owned by the players are not "things of value" in the context of anti-gaming statutes. (*See also* DE 18-2 (explaining that fictional in-game items "do[] not really exist" and "ha[ve] no redeemable value").

Similarly, Plaintiffs' attempt to transform heroes and talents into valuable property is untenable in the context of Cal. Penal Code § 319 and the Illinois Prizes Act. Both statutes require "prizes" be capable of actual distribution. *See, e.g.*, *Hotel Empl. & Rest. Empl Int'l Union v. Davis*, 21 Cal. 4th 585, 592 (1999) (finding "prize" under § 319 "encompasses property that the operator offers to distribute to one or more winning participants and not to keep for himself."); 815 ILCS 525/10 (defining "prize" to include item "of value" that is "awarded"). Castle Clash players never take ownership of heroes and talents (nor do Plaintiffs allege anything to the contrary). (*See also* DE 18-1 ¶ 3.)[2]

---

[1] While Cal. Penal Code § 330b covers a free replay, California courts hold this expansion creates a *sui generis* exception and does not otherwise impact the definition of a "thing of value." *See, e.g.*, *Merandette v. City & Cnty. of San Francisco*, 88 Cal. App. 3d 105, 113 (1979). Further, Michigan only encompasses the right to replay insofar as "free plays" may be converted "to cash" *by the proprietor*. *Oatman v. Davidson*, 310 Mich. 57 (1944); *People v. Lopez*, 187 Mich. App. 305, 309 (1991) (same). Plaintiffs do not contend they received (or could have received) a free replay or that there was a method by which Sky Union cashed players out.

[2] Plaintiffs contend that the Court cannot consider the Castle Clash Terms of Service at this stage (though they do not contest the validity of the document). While the Court need not turn to the Terms of Service to find that fictional videogame items have no value, courts often consider publicly available terms of service at the motion to dismiss stage. *See, e.g.*, *O'Connor v. Uber*

Plaintiffs' second argument—the alleged secondary market for Castle Clash accounts—fares no better. As an initial matter, Sky Union is not alleged to control the secondary markets. Sky Union expressly prohibits selling Castle Clash accounts, (*see* DE 18-1, ¶ 6), and no Plaintiff alleges they actually sold their account (or in fact that anyone ever has). Regardless, the mere existence of a secondary market is irrelevant to whether "value" exists.

Despite Plaintiffs' effort to gloss over *George v. National Collegiate Athletic Association*, that case is directly on point. The Court in *George* explained that "the presence of a secondary market is misleading" and "an inappropriate consideration" in determining whether a lottery prize existed because a secondary market for tickets is speculative. *See* 945 N.E.2d at 159. The Court compared the speculation of the secondary market for March Madness tickets to the market for a $100,000 gold coin, which value has little speculation. *Id.* Latching onto this, Plaintiffs contend there are "clearly established prices" for Castle Clash accounts on secondary markets. (DE 26 at 8.) Plaintiffs own complaint tells a different story. Rather than allege an established market price, Plaintiffs simply list a handful of websites and fail to allege an account ever actually sold (let alone what the "established price" is). (*See* DE 14 ¶¶ 42-44.)

The problems with resorting to a secondary market to establish gambling are self-evident. To allow a secondary market to convert Castle Clash into gambling would punish Sky Union for the actions of its customers, which the Terms of Service expressly prohibit. (*See* DE 18-1 ¶ 6.) Moreover, as a cursory search of eBay reveals, *anything* can be sold on a secondary market. This cannot mean, however, that the resale of Cracker Jack toys and antique baseball cards (both of which are obtained by chance) somehow turns Frito-Lay and Topps into illegal gambling

---

*Tech., Inc.*, 58 F. Supp. 3d 989, 1001 n.4 (N.D. Cal. 2014) (taking judicial notice of Uber's terms of conditions because they were available on Uber's website). Notably, Plaintiffs have not hesitated to rely on videogame terms of use in similar pending cases. *See, e.g.*, *Mason v. Machine Zone, Inc.*, Case No. 15-cv-1107, DE 1-2 (D. Md.).

operations. Indeed, accepting Plaintiffs' theory of value would turn heroes and talents into taxable gambling income. *See, e.g.*, *Shollenberger v. C.I.R.*, 98 T.C.M. (CCH) 667 (T.C. 2009) ("Gross income includes all income from whatever source derived, including gambling.").

## II. PLAINTIFFS' ALLEGED DAMAGES WERE *NOT* PROXIMATELY CAUSED BY THE WAGERING OF GEMS.

Plaintiffs' contention that they "were harmed as a direct result" of the wagering of gems stems from a fundamental misunderstanding of proximate cause, and underscores why Castle Clash is not casino gambling.

Plaintiffs assert that exchanging dollars for gems is no different than "exchang[ing] money for chips to wager at gaming tables." (*See* DE 26 at 9.) To the contrary, exchanging dollars for gems is very different. In the casino context, dollars are exchanged for chips, which can always be exchanged back for their exact dollar value. Until a chip is wagered, no money is actually staked nor can it actually be lost or won. On the other hand, once gems are purchased in Castle Clash, the transaction is complete and those gems can *never* be exchanged back for cash. (*See* DE 14 ¶¶ 21, 23.) Plaintiffs do not challenge this transaction. What a player later does with the gems—*i.e.*, use them to speed up the game or to recruit troops for battle or to do nothing at all—thus cannot cause a loss (let alone a "net loss"). (*See, e.g.*, DE 14 ¶¶ 45, 48, 51.)[3]

An analogous distinction carried the day in *In re MasterCard*, where the Court held that entities whose transactions preceded—and concluded before—the alleged gambling could not possibly have violated state anti-gaming laws. *See In re MasterCard Int'l Inc.*, 313 F.3d 257, 262 (5th Cir. 2002). Contrary to Plaintiffs' contentions, (*see* DE 26 at 10), *In re MasterCard* turned on the timing of the relevant transaction. *Id.*; *see also Reuter v. MasterCard Int'l, Inc.*,

---

[3] Plaintiffs' theory of "net loss" would necessarily require individual inquiries for each class member as to how a particular gem was used, whether that gem was free or paid for, what each class member received in return and how that class member values what they received.

397 Ill. App. 3d 915, 923 (2010) (dismissing LRA claim because any monetary transaction "occurs before any gambling takes place and is not affected by the outcome of the gambling."). As with the Mastercard cases, Plaintiffs' claims should be discarded because the purchase of gems—which they do not challenge—was complete prior to any of the alleged gambling.[4] Purchasing gems for use in a free-to-download game is in fact no different in kind than if Plaintiffs were to have purchased the game outright, which came with free gems (nor are Plaintiffs able to articulate a relevant distinction, (*see* DE 26 at 9 n.6)). Plaintiffs, presumably, would not contend all videogames—which can be sold on secondary markets—are gambling.

### III. SKY UNION HAS NO STAKE IN THE OUTCOME OF A GIVEN WAGER AND CANNOT BE A "WINNER" UNDER THE ILLINOIS LOSS RECOVERY ACT.

Plaintiff Soto contends Sky Union is a "winner" under the Illinois LRA because "operators of digital casino games are winners upon gaining the money people lost playing the games." (DE 26 at 12, internal quotations & citation omitted.) Sky Union, however, does not—and is not alleged to—gain money based on consumers playing the games at issue.

A winner under the LRA must place "'wagers' with particular participants by which it could lose money based on the happening of a future event"—in other words, it must "participate in the risk" of the wager. *Langone v. Kaiser*, No. 12 C 2073, 2013 WL 5567587, at *6-7 (N.D. Ill. Oct. 9, 2013); *see also Sonnenberg v. Oldford Grp., Ltd.*, No. 13-0344, 2014 WL 1017898, at *5 (S.D. Ill. Mar. 14, 2014) (holding a "winner" must "risk[] money in the gambling activity.").

Sky Union obviously does not participate in any wager. At best, Soto contends Sky Union has a direct stake because it sells gems, created the software and distributes heroes and talents. (DE 26 at 13.) Absent is any allegation concerning Sky Union's *participation* in the

---

[4] Plaintiffs contend a loss occurred where they were "awarded a hero worth less than the amount wagered." (DE 26 at 11.) This means a "loss" depends on the rate for heroes on sites like eBay on a given day. This highlights the absurdity of comparing Castle Clash to a casino.

alleged wagering. Sky Union is not alleged to wager anything nor does it stand any chance to win a hero or talent, *which is the object* of the alleged wagering. *See, e.g.*, *Manning v. Creative Headquarters, LLC*, No. 11-cv-2203, DE 83 at 3 (N.D. Ill. March 30, 2012) (dismissing Illinois LRA claim where "Defendants do not compete for the merchandise being auctioned").[5]

Moreover, it is clear from the complaint that Sky Union collects money *only* from the sale of gems, which it collects *regardless* of how or whether gems are used. *See Manning*, No. 11-cv-2203, DE 83 at 3 ("Because all participants' entry and bidding fees are certain to be lost to [defendants], such fees never hang in the balance because at no point do the . . . participants pay anything to defendants that is in any way dependent on the outcome of any auction."). In other words, Sky Union cannot be a "loser" under the LRA, and thus cannot logically be a winner. *See also Humphrey v. Viacom, Inc.*, No. 06-2768, 2007 WL 1797648, at *9 (D.N.J. June 20, 2007) ("To suggest that one can be a winner without risking the possibility of being a loser defies logic and finds no support in the law.").[6]

## IV. SOTO *STILL* FAILS TO ALLEGE A COGNIZABLE LOSS UNDER THE ILLINOIS PRIZES ACT.

The Illinois Prizes Act specifically restricts private rights of action to those who "suffer loss by reason of any intentional violation . . . ." 815 ILCS 525/40(b). Nonetheless, Plaintiff Soto contends that he suffered a loss based solely on the fact that he allegedly participated in unlawful Castle Clash events. (DE 26 at 15.) This contention fails on its face.

---

[5] Soto's contention that the LRA permits him to recover money in place of lost gems is contrary to the plain language of the statute. (DE 26 at 11 n.7.) The LRA permits only recovery of the thing lost. *See* 720 ILCS 5/28-8(a). Soto is not seeking recovery under subsection (b). Allowing Soto to use the LRA to recover fictional gems is the type of absurd result the Seventh Circuit cautioned against. *See Vinson v. Casino Queen, Inc.*, 123 F.3d 655, 657 (7th Cir. 1997).

[6] Further, as Soto recognizes, the allegations concerning his "loss" are deficient. (DE 26 at 11 n.8); *see also Sonnenberg*, 2015 WL 1379505, at *6 (holding to allege "loss," a plaintiff must "allege the exact amounts he purportedly lost gambling [and] when he lost the sum . . . ."). Soto's allegations fall short of this specificity. Moreover, Soto continues to allege a "net loss," but fails to explain what a net loss is in the Castle Clash context. (*See* DE 26 at 11; DE 14 ¶ 45.)

The Prizes Act requires an *actual loss*—not merely participation. Soto, however, alleges he purchased and received gems *and* also received a bonus item. (*See* DE 14 ¶ 47; DE 26 at 15 n.12.) It is clear Soto lost nothing: he received gems and a bonus item. Soto fails to allege he was entitled to anything more. *See Volpe v. Caribbean Cruise Line, Inc.*, No. 13 C 1646, 2013 WL 3724858, at *2 (N.D. Ill. July 16, 2013) (finding a loss under the Prizes Act where defendant entered into and breached a contract with plaintiff for a cruise). At best, Soto contends his loss was "not win[ning] one of the rare heroes." (DE 14 ¶ 47.) Soto's disappointment is not a loss. *Cf. Chaset v. Fleer/Skybox*, 300 F.3d 1083, 1087 (9th Cir. 2002) ("[D]isappointment upon not finding an insert card in the package is not an injury to property."); *Green v. Aztar Corp.*, No. 02 C 3514, 2003 WL 22012205, at *2 (N.D. Ill. Aug. 22, 2003) (same).[7]

## V. MICHIGAN AUTHORITY ESTABLISHES THAT EXELBY'S MICHIGAN LOSS RECOVERY ACT CLAIM IS PREEMPTED.

Exelby contends that her Michigan LRA claim is not preempted by the MGCRA because "the gambling alleged is not 'casino gambling' controlled by the MGCRA." (DE 26 at 14.) Notwithstanding her contention that Castle Clash *is* casino gambling, (*id.* at 5, 9), the MGCRA is neither drafted so narrowly nor have Michigan courts interpreted it so narrowly.

The MGCRA broadly applies "to all persons who are licensed or *otherwise participate in gaming* under this act." MCL § 432.203(4) (emphasis added). The MGCRA defines "gaming" to include "gambling game," which is, in turn, defined as "any game played with cards, dice, equipment or a machine, including any . . . electronic device . . . ." MCL § 432.202(v). The MGCRA thus applies well-beyond "Detroit-based casino gaming." (DE 26 at 15.).

---

[7] Soto asserts, for the first time in his opposition, two new theories of loss: (1) "receiving heroes worth less than the amount on each wager" and (2) money spent participating in the events he would not have spent but for the events. (DE 26 at 15.) Neither of these allegations are in the complaint, nor are they supported by fact. New allegations cannot be made in an opposition brief. *See Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984).

Michigan courts have broadly construed the MGCRA's preemptive reach to include suppliers of videogames. *See, e.g.*, *McEntee v. Incredible Tech., Inc.*, No. 263818, 2006 WL 659347, at *2 (Mich. Ct. App. Mar. 16, 2006) (unpub). Though Exelby declines to address *McEntee*, it is directly on point. In *McEntee*, the plaintiff asserted a loss recovery claim against the creator of the Golden Tee arcade game on the basis that its "Hole-n-Win" contest constituted unlawful gambling. *Id.* at *1. After thorough analysis, the Court held because the Golden Tee games are allegedly played for money, "the Golden Tee games are considered 'gambling games' under the plain language of MCL 432.202(v). Consequently, the Golden Tee games, as well as the suppliers of the games, are governed by the MGCRA." *Id.* at *2. The Court thus dismissed plaintiff's claim on the basis that it was preempted by the MGCRA. *Id.*; *see also In re Greektown Holdings LLC*, 516 B.R. 445, 454 (Bankr. E.D. Mich. 2014) (noting *McEntee* held the "[MGCRA] precluded the plaintiff's civil suit for money lost playing an arcade game that had a monetary reward because such dispute was within the MGCB's gaming jurisdiction."). Exelby's Michigan LRA claim is preempted by the MGCRA.[8]

### VI. PLAINTIFFS' UCL CLAIM FAILS AS A MATTER OF LAW BECAUSE IT LACKS A VALID PREDICATE CLAIM AND PLAINTIFFS RECEIVED THE FULL BENEFIT OF THE BARGAIN.

#### A. Plaintiffs Fail to Allege the Ability to Win a "Thing of Value" or "Property" Under California Penal Code §§ 330b & 319.

Plaintiffs try to save their penal code claims by citing a purported "broad interpretation" of the code afforded by California courts. (*See* DE 26 at 6, 21 n.19.) Even if California courts interpreted the penal code broadly—they don't—Plaintiffs' interpretation fails to save the claims.

First, California courts counsel *against* broad interpretations of the penal code. *See, e.g.*, *People v. Davis*, 29 Cal. 3d 814, 828 (1981). In fact, they specifically caution against broad

---

[8] Even if the Court finds Exelby's claim is not preempted, her claim fails because she did not lose money gambling, nor was she capable of winning valuable property. (*See* DE 18 at 20.)

interpretations of anti-gaming laws to avoid "mak[ing] innocuous, common practices a violation of California criminal law." *Haskell v. Time, Inc.*, 965 F. Supp. 1398, 1406 (E.D. Cal. 1997).

Second, though § 330b applies to slot machines that provide for a right to replay, that language does not help Plaintiffs. Section 330b is drafted in the disjunctive, applying to slot machines that entitle a player to receive a "thing of value or additional . . . right to use the slot machine." Cal. Penal Code § 330b. This language does not alter the meaning of "thing of value." *See Merandette*, 88 Cal. App. 3d at 114; Cal. Penal Code § 330.2 (defining "thing of value" as a tangible thing or representation thereof); *Gayer*, 59 Cal. App. 2d at 262 (noting accepted definition of a "thing" is an inanimate object and does not include "the right to the amusement of a free game"). A "thing of value" is thus limited to inanimate, tangible things of monetary value (or representations thereof). *See also People ex rel. Green v. Grewal*, -- P.3d --, 2015 WL 3893494, at *11 (Cal. June 25, 2015) (holding a slot machine must award or entitle a player to "cash or other prizes of value"). A hero or talent certainly does not meet this definition.

Similarly, California courts have not adopted the boundless definition of "property" under § 319 Plaintiffs urge. (*See* DE 26 at 22-23.) Rather, California courts limit property to "money, goods, chattels, things in action, and evidences of debt" and a "thing of which there may be ownership." *People v. Settles*, 29 Cal. App. 2d Supp. 781, 786 (Cal. App. Dep't Super. Ct 1938). Plaintiffs *do not* allege (or eargue in their opposition) heroes and talents are property over which they have ownership. (*See* DE 26 at 23; *see also* DE 18-1, ¶ 6.). The actions of consumers allegedly attempting to sell their accounts on black markets does not change this fact.

B. **The UCL Cannot be Used to Recover Gambling Losses.**

Plaintiffs contend they can use the penal code to prop up a UCL claim. (*See* DE 26 at 19.) The UCL, however, cannot being used to recover gambling losses.

California has a longstanding "public policy against judicial resolution of civil claims arising out of gambling contracts or transactions." *Jamgotchian v. Scientific Games Corp.*, 371 F. App'x 812, 813 (9th Cir. 2010); *see also Kelly v. First Astri Corp.*, 72 Cal. App. 4th 462 (1999) (same). This includes the use of the UCL to state civil claims arising out of gambling. *See, e.g.*, *Alves v. Players Edge, Inc.*, No. 05cv1654, 2007 WL 6004919, at *14 (S.D. Cal. Aug. 8, 2007) (finding UCL claim barred pursuant to "California's strong and broad public policy"); *Mota v. Santa Anita Park, et al.*, No. BC31994, 2005 WL 5705000 (Cal. Sup. Ct. Dec. 23, 2005) (same); *cf. Jamgotchian*, 371 Fed. App'x at 813 (noting that a claim "to be placed in the *ex ante* position after losing a bet" is a suit to recover gambling loses and is thus barred) (internal citation omitted). Accordingly, Cal. Penal Code §§ 319 & 330b cannot underlie a UCL claim.

### C. Plaintiffs Do Not Allege an Injury in Fact Under the UCL.

To allege a UCL claim, a "plaintiff needs to have 'suffered injury in fact and . . . lost money or property as a result of the unfair competition.'" *Rubio v. Capital One Bank*, 613 F.3d 1195, 1203 (9th Cir. 2010). It is axiomatic that one who receives the benefit of their bargain cannot bring a UCL claim. *See Johnson v. Mitsubishi Dig. Elect. Am. Inc*., 365 F. App'x 830, 832 (9th Cir. 2010) ("If one gets the benefit of his bargain, he has no standing under the UCL.").

Plaintiffs contend "they suffered economic injuries by wagering on rolls and buying into events." (DE 26 at 17.) This does not suffice for a UCL injury. Contrary to Plaintiffs' belief, a "loss" does not occur under the UCL simply by parting with money—such a definition would "encompass[] every purchase or transaction where a person pays with money." *Peterson v. Cellco P'ship*, 164 Cal. App. 4th 1583, 1592 (2008). Plaintiffs also argue that but for the games, "the injuries would not have occurred" insofar as the games would not have existed. (DE 26 at 17.) This also fails. *See, e.g.*, *Koh v. S.C. Johnson & Son, Inc.*, No. 09-00927, 2010 WL 94265,

at *2 (N.D. Cal. Jan. 6, 2010) ("[B]eing induced to purchase a product . . . is not loss of money or property within the meaning of the [UCL] as long as one still receives the benefit of the bargain."); *Hall v. Time*, 158 Cal. App. 4th 847, 854-55 (2008) (same); *Germain v. J.C. Penney Co.*, No. 09-2847, 2009 WL 1971336, at *6 (C.D. Cal. July 6, 2009) (same). Plaintiffs do not allege—as they must—that there was anything wrong with the gems they bought or that they did not want them (indeed, they used the gems without incident). They are, at most, and well after the fact, dissatisfied with how they *used* them—this is not a UCL loss.

Plaintiffs quixotically assert they did not receive what they bargained for because they bargained for legal games, not illegal games. (DE 26 at 18.) First, the only relevant transaction was the purchase of gems, which Plaintiffs plainly received (and used).[9] Second, Plaintiffs' circular post-hoc rationalization lacks any semblance of logic. Contrary to Plaintiffs' contention, this is not analogous to a mislabeling case where consumers were *led* to believe a product was "Made in the U.S.A." (*See* DE 26 at 18, citing *Kwikset Corp. v. Superior Court*, 246 P.3d 877 (Cal. 2011).) Plaintiffs do not allege they were misled in any fashion. And in any event, the legality of an in-app game could not have had any impact on the bargain at issue because "every man is presumed to know the law." *United States v. Bryza*, 522 F.2d 414, 423 (7th Cir. 1975).

### VII. PLAINTIFF SOTO'S ICFA CLAIM FAILS BECAUSE THERE IS NO UNDERLYING UNFAIR PRACTICE AND BECAUSE HE RECEIVED THE FULL BENEFIT OF THE BARGAIN.

#### A. Soto Fails to Allege an Underlying Unfair Practice.

Soto contends he alleged an unfair practice on the basis of Sky Union's violations of Illinois law, and further that he separately alleged an unfair practice based on its violation of Illinois public policy. (DE 26 at 23-24.) Neither survives scrutiny.

---

[9] Plaintiffs assert "the gems they purchased did not have the utility they bargained for." (DE 26 at 18.) Apart from the fact that this assertion is nowhere in the complaint, Plaintiffs *do not* allege there was anything they were prevented from doing with the gems they purchased.

First, as demonstrated above and as detailed in Sky Union's opening memorandum, Soto failed to adequately allege a violation of the Illinois LRA and Prizes Act.[10] *See, e.g.*, *Kim v. Riscuity, Inc.*, No. 06-1585, 2006 WL 2192121, at *4 (N.D. Ill. July 31, 2006) (Kennelly, J) (finding if underlying unfair conduct is inadequately pled, "there is no violation of the ICFA").

Second, Soto's effort to allege an independent ICFA claim on the basis that Sky Union promotes illegal gambling is similarly misguided. (DE 26 at 24.) ICFA "is concerned with public policy as established by statutes and the common law," not vague notions of what a (legal) videogame may promote. *Batson v. Live Nation Enter., Inc.*, 746 F.3d 827, 833 (7th Cir. 2014). Even if there were a public policy against promoting illegal gambling, conduct is not "unfair" under ICFA "if a consumer can avoid the defendant's practice by seeking an alternative elsewhere." *Id.*; *see also Siegel v. Shell Oil*, 612 F.3d 932, 937 (7th Cir. 2010) (same). Soto's allegation that he could not have avoided the injury is conclusory at best. (*See* DE 26 at 23; DE 14 ¶ 113.) Common sense dictates there were myriad alternatives available to Soto—indeed, there were myriad alternative uses for gems within Castle Clash alone. (*See* DE 14 ¶¶ 2, 23.)

### B. Soto Received the Full Benefit of His Bargain and Thus His ICFA Claim Fails as a Matter of Law.

Like the UCL, a plaintiff must show actual "pecuniary loss" to pursue an ICFA claim. *See Kim v. Carter's Inc.*, 598 F.3d 362, 365 (7th Cir. 2010). And, like the UCL, an ICFA claim fails as a matter of law where the plaintiff received the full benefit of the bargain. *Id.* at 365-66.

In a misguided effort to meet this pleading threshold, Soto analogizes the in-app games to product defect cases. (*See* DE 26 at 18, citing *Wiegel v. Stork Craft Mfg., Inc.*, 780 F. Supp. 2d 691 (N.D. Ill. 2011).) This analogy is far off the mark. Soto fails to allege anything approaching

---

[10] Soto's ICFA claim is actually only predicated on the alleged Illinois LRA violation. (*See* DE 14 ¶¶ 113-116.) In any event, Soto does not adequately allege a violation of either statute.

a product defect. In fact, he alleges no trouble purchasing gems (the only relevant transaction), using gems or playing in-app games at all. *See, e.g.*, *Frye v. L'Oreal, Inc.*, 583 F. Supp. 2d 954, 958 (N.D. Ill. 2008) (dismissing ICFA claim where plaintiff failed to allege the unfair practice "had any observable economic consequences"). Indeed, Soto fails to allege—as he must—that he would not otherwise have purchased any gems but for use in the games. *Id.*

Soto's only contention that he received less than what he bargained for is the illogical notion that he bargained for legal in-app games and received illegal in-app games. (DE 26 at 18.) Soto fails to allege that the purported illegality of the games (which has not and cannot be established) had any effect on the price of gems (which he retained the full benefit of). And as a matter of law, it could not have any impact on the bargain at issue. *See Bryza*, 522 F.2d at 423.

## VIII. SOTO & EXELBY'S SUPERFLUOUS UNJUST ENRICHMENT CLAIMS MUST BE DISMISSED.

Lastly, Soto and Exelby contend their unjust enrichment claims should stand because they are permitted to plead alternative claims. (DE 26 at 25.) Neither, however, are pleaded in the alternative. Moreover, duplicative claims are often dismissed, especially where a UCL claim is alleged. *See, e.g.*, *In re Apple & AT&T iPad Unlimited Data Plan Litig.*, 802 F. Supp. 2d 1070, 1077 (N.D. Cal. 2011) ("[P]laintiffs cannot assert unjust enrichment claims that are merely duplicative of statutory or tort claims."); *S & A Futures, LLC--Series 2 v. Sysco Chi., Inc.*, No. 11 C 7629, 2012 WL 851556, at *9 (N.D. Ill. Mar. 13, 2012) ("[C]ourts have the authority to dismiss duplicative claims if they allege the same facts and the same injury.") (Kennelly, J.) (internal citation omitted); *Ruffin-Steinback v. dePasse*, 267 F.3d 457, 462 (6th Cir. 2001) (affirming dismissal of duplicative unjust enrichment claim). The unjust enrichment claims are *identical* in every relevant respect to the UCL and ICFA claims. (*See* DE 14 ¶¶ 118, 120, 136, 138.) Plaintiffs' semantic distinctions are unpersuasive. (*See* DE 26 at 25.)

The unjust enrichment claims must also be dismissed because Soto and Exelby received what they bargained for.  *See, e.g.*, *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 520 (7th Cir. 2011) (holding no unjust enrichment where consumer received what he wanted, because "the retention of [his] money is not detrimental to him").  Soto and Exelby bought and received gems.  They do not allege the gems were worth less than they paid or did not function properly.  And, they used the gems exactly as they wanted.  Plaintiffs are not entitled to use the gems and get their money back.  Sky Union could not plausibly have been unjustly enriched at their expense.

## CONCLUSION

For the foregoing reasons, Sky Union, LLC respectfully requests this Court to enter an order: (i) dismissing Plaintiff Jose Soto, Christine Exelby and Tanner Eastman's First Amended Class Action Complaint in its entirety and with prejudice for failure to state a plausible claim for relief and (ii) awarding all such other relief as deemed equitable and just.

**DATED**: October 20, 2015  Respectfully submitted,

*/s/ David S. Almeida*

David S. Almeida, Esq.
dalmeida@sheppardmullin.com
David M. Poell
dpoell@sheppardmullin.com
Mark S. Eisen
meisen@sheppardmullin.com
**SHEPPARD, MULLIN,
RICHTER & HAMPTON LLP**
70 West Madison Street, 48th Floor
Chicago, Illinois  60602
Telephone:  (312) 499-6300
Facsimile:  (312) 499-6301

*Counsel for Sky Union, LLC*

## **CERTIFICATE OF SERVICE**

      The undersigned hereby certifies that a true and correct copy of the above and foregoing **REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS FIRST AMENDED CLASS ACTION COMPLAINT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)** was served upon all interested parties using this Court's ECF filing system this 20th day of October, 2015.

                                                 /s/ *David S. Almeida*